## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ELLSWORTH WILLIAM JEFFERIES III
ROCKY GARNER,
MISTY COYAZO,
JOSE L. RAMIREZ Jr,
KENIQUE SMITH,                                    **NO.: 25-2352**
ESTELLE WHITE,
DIANE L. WOODS, individually and as the
administrator of the Estate of CECIL B. McBEE,
Individually and on behalf of those similarly situated.

        Named Plaintiffs,                          **JURY TRIAL REQUESTED**

v.
                                                 **Complaint — Class Action**
HARCROS CHEMICALS INC.;
HARCROS CHEMICALS INC. EMPLOYEE STOCK
OWNERSHIP PLAN TRUST;
PHILIPS ELECTRONICS NORTH AMERICA CORPORATION;
KONINKLIJKE PHILIPS N.V.;
ELEMENTIS CHEMICALS, INC.;
ELEMENTIS PLC;
and ABC CORPORATIONS (1-5).

        Defendants.

---

## ISSUE CLASS ACTION COMPLAINT FOR
## THE FOLLOWING CAUSES OF ACTION

**COUNT I: Strict Liability - Abnormally Dangerous Activity**
**COUNT II: Gross Negligence**
**COUNT III: Negligence**
**COUNT IV: Negligent Maintenance and Repair**
**COUNT V: Wrongful Death**
**COUNT VI: Punitive Damages**

Plaintiffs, Ellsworth William Jefferies III, Rocky Garner, Misty Coyazo, Jose L. Ramirez Jr., Kenique Smith, Estelle White, and Diane L. Woods, both individually and as the administrator of the Estate of Cecil B. McBee, individually, collectively ("Plaintiffs" or "Named Plaintiffs"), and on behalf of those similarly situated (collectively the "Class"), through their undersigned counsel, state as follows for this class action complaint against the above-captioned Defendants:

## NATURE OF THE ACTION

1. The plaintiffs named above are representatives of the Kansas City, Kansas community, which has been and continues to be exposed to a "toxic cocktail" of emissions originating from a facility located at 5200 Speaker Rd, Kansas City, KS 66106 ("Facility"). These emissions include various likely and known human carcinogens, such as Ethylene Oxide ("EtO"), Cumene, Formaldehyde, Tetrachloroethylene ("PERC"), Epichlorohydrin, Ethyl Benzene, Nonylphenol, Propylene Oxide, and Vanadium (collectively referred to as "EtO and other toxic chemicals"). Throughout the relevant class period, this Facility has been owned and/or operated in succession by one or more of the named Defendants from December 1960 to the present.

2. Due to exposure to the poisoned air, Plaintiffs have suffered severe injuries, including blood cancers, lung cancer, liver cancer, and breast cancer—and one has died as a result.

3. Plaintiffs have all lived within three miles of the facility—well within the toxic air plume—for substantial periods of their lives. Plaintiffs seek to proceed in this matter together as representatives of the impacted community, by and through the Rule 23(c)(4) issue class-action vehicle, for greater efficiency in achieving a just resolution of the common issues arising from Defendants' conduct, while preserving individualized issues like specific causation and damages of putative class members for subsequent proceedings.

4. Under LR 40.2(a), Plaintiffs request that this matter be tried in Kansas City, Kansas, and unless the Court orders otherwise, the Plaintiffs herein request, under the local rules, that the case be filed, docketed, and maintained in Kansas City, Kansas.

## GENERAL BACKGROUND

5. Since December 1960, Defendants have knowingly emitted dangerous quantities of neurotoxins, endocrine disruptors, DNA mutagens, and human carcinogens into the air of Kansas City, Kansas, thereby contaminating the surrounding community.

6. These dangerous emissions are continuous, ongoing, and periodically include sudden or accidental discharges.

7. Despite the predictable dangers to human health and safety, exposure to these emissions was unjustifiably allowed. This has led to substantial harm for individuals who have inevitably inhaled dangerously elevated levels of this toxic mix of chemicals, often for their entire lives.

8. Named Plaintiffs represent the spectrum of relevant chronic injury groups for illnesses proximately caused by their exposure to EtO and other toxic chemicals.

9. Additional chronic injury groups are expected to be identified during the discovery process. These alleged injuries are not exclusive; instead, they serve as prime examples of the many forms of human harm caused by this toxic cocktail.

10. Of urgent concern, the following K–12 schools fall well within the toxic plume, placing over five thousand students at ongoing risk from daily exposure to hazardous air contaminants at these and other area schools:

- Turner Elementary School (570)[1]
- Turner Middle School (571)[2]
- Turner High School (1,134)[3]
- Turner Sixth Grade Academy (280)[4]
- Lindbergh Elementary School (178)[5]
- Emerson Elementary School (180)[6]
- New Stanley Elementary School (224)[7]
- El Centro Academy for Children (total enrollment not available)[8]
- Frances Willard Elementary School (400)[9]
- Eugene Ware Elementary School (244)[10]
- Wyandotte High School (1,841)[11]

---

[1] *National Center for Education Statistics*,
https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?Search=1&DistrictID=2012360&ID=201236000022
(Accessed: 16 June 2025).
[2] *National Center for Education Statistics*,
https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?ID=201236001520 (Accessed: 16 June 2025).
[3] *National Center for Education Statistics*,
https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?Search=1&DistrictID=2012360&ID=201236000024
(Accessed: 16 June 2025).
[4] *National Center for Education Statistics*,
https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?Search=1&DistrictID=2012360&ID=201236001859
(Accessed: 16 June 2025).
[5] *National Center for Education Statistics*,
https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?Search=1&SchoolID=200795001430&ID=200795001430
(Accessed: 16 June 2025).
[6] *National Center for Education Statistics*,
https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?Search=1&SchoolID=200795001395&ID=200795001395
(Accessed: 16 June 2025).
[7] *National Center for Education Statistics*,
https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?Search=1&SchoolID=200795001409&ID=200795001409
(Accessed: 16 June 2025).
[8] Childcare Center, https://childcarecenter.us/provider_detail/el_centro_academy_for_children_kansas_city_ks
(Accessed: 16 June 2025).
[9] *National Center for Education Statistics*,
https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?Search=1&SchoolID=200795001413&ID=200795001413
(Accessed: 16 June 2025).
[10] *National Center for Education Statistics*,
https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?Search=1&SchoolID=200795001410&ID=200795001410
(Accessed: 16 June 2025).
[11] *National Center for Education Statistics*,
https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?Search=1&SchoolID=200795001420&ID=200795001420
(Accessed: 16 June 2025).

= *5,737 total students within the plume in the 2023-2024 school year*

11. Multiple generations attending these schools have been unjustly and unknowingly inhaling harmful amounts of human carcinogens, neurotoxins, and DNA mutagens—substances particularly dangerous to children.

12. Many of those former students have since developed and passed away from preventable diseases caused by the toxic emissions.

13. This site is far from a relic of past pollution; it remains an active and alarming hazard. The facility's EPA Risk Screening Environmental Indicators (RSEI) score indicates its extreme hazard level.[12]

14. For example, in 2021, the national median score for any facility was 14 points. In Kansas, it was 10. In Wyandotte County, it was a staggering 320 points. Harcros is designated as "Surface Active Agent Manufacturing"—a facility type with a median industry score that was far higher, at 2,369. This Facility's risk score in 2021 was **6,470,152**. That exceeds the collective score—and thus the risk posed—of 2,700 separate median-risk facilities of the same hazardous industry type designation.

15. This severity is also reflected in the average age at death of the surrounding communities, which is a median of 20 years shorter than that of other residents in Wyandotte County, just a few miles further west.

---

[12] https://enviro.epa.gov/envirofacts/tri/rsei?facid=66106HRCRS5200S

16. This action, and the related action to be filed in the near future,[13] seeks to compensate, deter, and prevent further generations of needless deaths in the impacted Kansas City community. Aggregate litigation—specifically by way of the issue class action—is the superior method of administering justice towards a reasonable resolution.

## PARTIES

### I.    NAMED PLAINTIFFS/CLASS REPRESENTATIVES

17. Plaintiff Misty Coyazo is a lifelong resident of Kansas City, Kansas, who lived near the Facility from birth through her late teens. Ms. Coyazo also attended New Stanley Elementary, which is well within the toxic plume, just like her home. As a result of this prolonged exposure, Misty developed Acute Myeloid Leukemia (AML), a form of blood cancer, at the age of 31, requiring an aggressive treatment regimen that has had long-lasting adverse impacts on her health.

18. Plaintiff Rocky Garner, currently residing in Arkansas, lived near the Facility for over a decade. As a professional truck driver, Mr. Garner's work brought him even closer to the Facility, given its grandfathered status in a light industrial-zoned area primarily composed of shipping and fulfillment centers. Due to prolonged exposure to toxins emitted by the facility, he developed and was diagnosed with liver cancer in 2005. His treatment included aggressive chemotherapy, radiation therapy, a liver transplant, and gallbladder removal surgery.

19. Plaintiff Ellsworth William Jeffries III, a lifelong resident of Kansas City, Kansas, attended New Stanley Elementary School and had significant residential exposure within the toxic

---

[13] The related action to be filed soon seeks proactive medical monitoring injunctive relief.

plume. As a result of his prolonged exposure to the facility's toxic emissions, Mr. Jeffries developed and was diagnosed with Multiple Myeloma in 2020, a type of blood cancer requiring extensive chemotherapy and stem cell replacement. He continues to experience new and worsening conditions following his cancer and its treatment.

20. Plaintiff Jose L. Ramirez Jr. is a longtime resident of Kansas City, Kansas, and attended Emerson Elementary School. Mr. Ramirez developed and was diagnosed with Lung Cancer in 2018, after prolonged exposure to toxins emitted by the Facility. He has undergone multiple surgeries related to his cancer and has suffered significantly concerning his quality of life.

21. Plaintiff Kenique Smith, a current resident of Texas, lived within two miles of the Facility for most of her youth and attended Lindbergh Elementary School. As a result of this prolonged exposure to toxins from the Facility, she developed and was diagnosed with breast cancer at age 35. Throughout her extensive battle with the disease, Ms. Smith underwent extensive rounds of chemotherapy, radiation therapy, and nearly a dozen surgeries, including a double mastectomy.

22. Plaintiff Estelle White lived in Kansas City, Kansas, for approximately a decade and attended Emerson Elementary School. Ms. White experienced a tragic miscarriage at the age of 19, an event that led to testing, which revealed she also had cervical cancer. In 2022, at the age of 34, Ms. White was diagnosed with breast cancer. Ms. White alleges that her miscarriage and her two cancer diagnoses were proximately caused by the toxic emissions from the facility and her childhood exposure to the same.

23. Plaintiff Diane L. Woods, a lifelong resident of Kansas City, Kansas, attended Emerson Elementary School. After years of continuous exposure to the Facility's toxic emissions, she

was diagnosed with breast cancer and underwent over 40 rounds of radiation treatments. Additionally, she is the daughter and legal representative of the Estate of her late father, Cecil B. McBee, and, in addition to her individual claims, brings claims as the Administrator of Mr. McBee's Estate. Mr. McBee lived near the Facility and was diagnosed with non-Hodgkin's Lymphoma following prolonged exposure to the Facility's toxic emissions. After his diagnosis, he underwent chemotherapy but ultimately succumbed to the disease several years later while still in treatment. Ms. Woods alleges that her father's death was proximately caused by the toxic emissions released by the Defendants at the Facility.

## II.    HARCROS-GROUP DEFENDANTS

24. Defendant **Harcros Chemicals Inc ("Harcros")** is a domestic for-profit corporation organized and existing under the laws of the State of Kansas, with its principal place of business located at 5200 Speaker Road, Kansas City, Kansas 66106. Harcros Chemicals Inc. is registered with the Kansas Secretary of State and is in active and good standing. Its resident agent for service of process is C T Corporation System, with a registered office address at 112 SW 7th Street, Suite 3C, Topeka, Kansas 66603.

25. Harcros is the latest in a series of corporate successors to own and operate the Facility.

26. Harcros has formerly done business as: HCI Acquisitions Inc., Thompson-Hayward Chemicals Company ("THCC"), and Thompson-Munro-Robins Chemical Co.

27. Harcros began business in 1917 as Thompson, Munro and Robins, and changed its name to THCC in 1923. North American Philips acquired THCC in 1961. In 1981, the company again changed hands when Harrisons and Crosfield plc (now Elementis Chemicals, Inc.) purchased the bulk of the business from North American Philips.

28. The company's name was changed to Harcros Chemicals, Inc. in 1988. In 2001, a management buyout resulted in the privatization of Harcros. It remains a privately held corporation today and is employee-owned, effective January 2014, through the creation of an ESOP.

29. Defendant **Harcros Chemicals Inc. Employee Stock Ownership Plan Trust ("ESOP")** is a Domestic Business Trust in the jurisdiction of Kansas, with its principal place of business located at 5200 Speaker Road, Kansas City, Kansas 66106. ESOP is registered with the Kansas Secretary of State and is in active and good standing. Its resident agent for service of process is C T Corporation System, with a registered office address at 112 SW 7th Street, Suite 3C, Topeka, Kansas 66603.

30. ESOP is understood to have an ownership interest in Harcros Chemicals, Inc. since, at least, 2021. ESOP's ownership and actual control of Harcros is the basis of it's liability.

31. Recent environmental enforcement actions against Harcros include:

    a. In 2016, Harcros was fined ~$1,000,000.00 for Clean Air Act violation(s) in Atchison, Kansas. Harcros pled guilty to negligently combining nearly 10,000 gallons of highly reactive chemicals—causing a greenish-yellow chlorine gas cloud to form that caused evacuation and shelter in place orders, creating a public health crisis which sent nearly 150 people to seek medical attention;[14]

    b. On May 29, 2012, the U.S. Environmental Protection Agency (EPA) entered into an Administrative Order on Consent with Harcros, T H Agriculture and Nutrition

---

[14] https://www.justice.gov/usao-ks/pr/harcros-chemicals-pleads-guilty-violating-clean-air-act

Company, Inc. (THAN), which had been a subsidiary of North American Philips Corporation, and Elementis Chemicals Inc. for cleanup work at the Harcros Chemicals Inc. site in Davenport, Iowa—where the cleanup work is expected to address over 1.2 million cubic yards of groundwater contamination.[15]

32. Harcros has paid more than eight million dollars in environmental penalties since 2000.[16]

33. This is a long-standing pattern for Harcros and its legacy entities. For example, a Fresno, California Thompson-Hayward Chemical Company site was put on the National Priorities List as of 1988. The five-acre site was formerly the location of an agricultural chemical formulation, packaging, and warehousing plant that operated from 1942 to 1981.

34. As recently as September 2019, Harcros was issued what appears to be its latest penalty by the EPA for the Facility under RCRA, following an entry into a consent decree with a penalty of $139,745 and a compliance cost of $167,000. The EPA alleged that Harcros improperly handled, used, stored, and disposed of the highly toxic and likely carcinogenic substance vanadium pentoxide.[17] Among other allegations of egregious wrongdoing, the EPA stated that:

---

[15]https://www.epa.gov/enforcement/case-summary-settlement-groundwater-contamination-cleanup-harcros-chemicals-site-iowa#:~:text=and/or%20adsorption.-,Information%20about%20the%20Administrative%20Order%20on%20Consent,as%20a%20drinking%20water%20source.&text=c)%20institutional%20controls.,measures%20to%20address%20contaminated%20groundwater.

[16]https://violationtracker.goodjobsfirst.org/parent/harcros-chemicals#:~:text=Current%20Parent%20Company%20Name:%20Harcros,separate%20announcements%20of%20the%20outcome.

[17] Doc. No. RCRA-07-2019-0251.

> 37.    Surfaces contaminated with discarded vanadium pentoxide hazardous waste (P120) that could not be cleaned by sweeping were hosed with water. Washdown water from the production area either flowed into the surface trench or into a drain within the diked area where the mixing tank is located (Tank Dike 1), and then flowed into the waste water system and to an equalization tank (EQ Tank), before it was discharged to the Wyandotte County, Kansas wastewater treatment facility.

## III.    PHILIPS-GROUP DEFENDANTS

35. Defendant **Philips Electronics North America Corporation ("PNA")** f/d/b/a North American Philips is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the United States. Philips Electronics North America Corporation is registered with the Delaware Secretary of State and remains in active status. Its registered agent for service of process is The Corporation Trust Company, with a registered office address at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

36. PNA controlled, owned, and operated the Facility from 1961-1981.

37. Defendant **Koninklijke Philips N.V. ("KP")** is a public limited liability company organized under the laws of the Netherlands with a principal place of business at High Tech Campus 52 NL-5656 AG Eindhoven, Netherlands.

38. KP has previously operated as Firma Philips & Co (1891–1912), N.V. Philips' Gloeilampenfabrieken (1912–1994), Philips Electronics N.V. (1994–1998), and Koninklijke Philips Electronics N.V. (1998–2013).

39. KP was started by Fredrick Philips and his son Gerard Philips in 1891, and benefited from the tremendous wealth accumulated by their father/grandfather Lion Philips, a Dutch tobacco trade

tycoon in the early and mid-1800s, benefiting from the market conditions fueled by the tobacco plantation system in the American South.

40. PNA is a wholly owned and controlled subsidiary of Defendant KP.

41. According to the Kansas Department of Health and Environment ("KDHE"), the facility became operational in December 1960 and was sold to Philips in 1961. At that time, operations included the wholesale distribution of industrial chemicals and supplies, as well as the production of phenoxy herbicides, primarily 2,4-dichlorophenoxyacetic acid (2,4-D).[18] 2,4-D was classified as a "possible human carcinogen" by the IARC in 2016 due to a combination of strong mechanistic evidence and insufficient epidemiological data, primarily because 2,4-D, as a pesticide, is commonly mixed with other pesticides, making attribution science challenging.[19]

42. In 1963, a process building was constructed at the Facility to manufacture 2,4,5-trichlorophenoxyacetic acid (2,4,5-T). 2,4,5-T was banned in 1985 and was known to contain high levels of dioxin, a contaminant found to cause cancer and other health problems in people.[20] On information and belief, dangerous quantities of dioxin were emitted into the air from the Facility during this production period.

43. In ~1965, an ethoxylation plant was constructed at the Facility, and surfactant agents, including industrial emulsifiers, wetting agents, and antifoam agents, were manufactured.[21]

---

[18] Retrieved from https://keap.kdhe.ks.gov/ber_isl/ISL_Pub_Detail.aspx?ProjectCode=C410571091 (last accessed April 7, 2025).

[19] See https://www.iarc.who.int/wp-content/uploads/2018/07/pr236_E.pdf (last accessed April 7, 2025).

[20] See https://www.epa.gov/ingredients-used-pesticide-products/24-d (Last accessed April 7, 2025).

[21] https://keap.kdhe.ks.gov/ber_isl/ISL_Pub_Detail.aspx?ProjectCode=C410571091 (last accessed April 7, 2025)

44. Ethoxylation is a chemical manufacturing process in which ethylene oxide reacts with a compound, like an alcohol or acid, to create products known as ethoxylates. These are often used as surfactants.

45. Therefore, EtO use and emissions from the facility started no later than 1965, and that start occurred during the Philips-Group Defendants' ownership and control.

46. In approximately 1967, the facility began producing 2-(2,4,5-trichlorophenoxy) propionic acid (Silvex). The EPA banned Silvex for most uses in 1979 and altogether banned it in the US in 1985 due to its unreasonable dangers as a toxin.[22] All these concerning developments occurred during Philips' ownership and control, and before the EPA or KDHE were established in the early to mid-1970s.

## IV.    ELEMENTIS-GROUP DEFENDANTS

47. Defendant **Elementis Chemicals, Inc. ("ECI")** is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in the United States. Elementis Chemicals Inc. is registered with the Delaware Secretary of State. Its registered agent for service of process is The Corporation Trust Company, with a registered office address at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

48. ECI controlled, owned and operated the Facility from 1981-2001.

---

[22] Retrieved from https://oehha.ca.gov/water/chemicals/silvex (Last accessed April 7, 2025).

49. Defendant **Elementis PLC** is a public limited company organized and existing under the laws of the United Kingdom, with its registered office located at The Bindery, 5th Floor, 51-53 Hatton Garden, London, United Kingdom, EC1N 8HN.

50. As per the 2023 Annual Report of Elementis PLC, ECI is a wholly owned subsidiary of Defendant Elementis PLC.[23]

51. Elementis PLC's legacy entity was founded in 1844 as Harrisons & Crosfield, initially engaged in the tea trade. Over the next 150 years, it evolved into a significant player in Southeast Asia's plantation industry, profiting from the monopolized colonial control and exploitation of local labor. As decolonization progressed, the company gradually divested its plantation interests and refocused its business on other industries. It diversified into chemicals, timber, construction materials, and animal feed before eventually concentrating solely on chemicals and rebranding as Elementis.

52. Throughout its history, Elementis' growth has been deeply intertwined with the exploitation of the land and labor emblematic of colonization.

## V.    ADDITIONAL-DEFENDANTS GROUP

53. Defendants **ABC CORPORATIONS (1-5)** are currently unknown corporations or entities that owned, operated, managed, or otherwise participated in the Facility's control and are liable for the tortious conduct, injuries, and damages alleged herein.

---

[23] Koninklijke Philips N.V., *2023 Annual Report*, https://www.results.philips.com/publications/ar23?type=annual-report (last visited Mar. 4, 2025).

54. ABC CORPORATIONS (1-5) are legally accountable for the wrongful acts alleged herein, whether through their own actions, vicariously or indirectly, or through a combination of both. Additional corporate entities, including their successors and assigns, whether presently known or unknown, may also bear liability under these legal theories. Plaintiffs reserve the right to amend the pleadings to include additional defendants as discovery unfolds and the identities of all relevant and responsible parties are revealed. Consequently, Plaintiffs have designated ABC Corporations 1-5 as placeholders for such potential additions.

## VENUE AND JURISDICTION

55. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the Class is a citizen of a different state than Defendants, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply to this action.

56. This Court has personal jurisdiction over Defendants because they operate or previously operated an industrial facility physically located within this District, currently conduct or previously conducted business throughout this District, and committed tortious acts within this District that are the subject of this suit.

57. 28. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims of Plaintiffs and the Class occurred in this District.

## PRIMARY TOXIN OF CONCERN: ETHYLENE OXIDE (EtO)

58. The man-made chemical compound EtO was first discovered in 1859 by a French chemist, Charles-Adolphe Wurtz, while studying the reaction between ethylene and chlorine.

59. While trace amounts of EtO are found in nature, industrial-scale manufacturing of EtO is necessary for the large volumes used in various industries.

60. The half-life of EtO in the atmosphere has been reported to be as long as 211 days. Neither rain nor absorption into aqueous aerosols effectively removes ethylene oxide from the atmosphere.

61. Most EtO produced in the United States is used as an intermediate in the production of other, more complex industrial chemicals.

62. EtO is extremely flammable and explosive in its room-temperature gaseous form; therefore, it is typically handled and shipped as a refrigerated liquid to mitigate those risks.

63. EtO is so explosive that it is one of the main components in thermobaric and "fuel-air explosive" weapons used by the US military, sometimes referred to as "vacuum bombs." These bombs often produce an atomic-mushroom-like smoke signature and blast characteristics that look like "mini-nukes." They are among the most powerful non-nuclear weapons in our country's arsenal. EtO is a preferred compound for such military uses because it has a shock wave effectiveness of 5:1 compared to dynamite.[24]

---

[24] Meyer R, Köhler, J., Homberg A. *Explosives. 6th ed*. Weinheim, Germany: Pg. 142. See also, Denney v. United States, 185 F.2d 108, 110 (10th Cir. 1950) ("when highly explosive and inherently dangerous substances are kept or used in thickly populated areas or in proximity to homes and buildings, so as to make danger extreme and injury probable, the courts have held possession or use a nuisance per se, and imposed strict liability for damages or injuries resulting therefrom.")

64. Beyond its explosive traits, the DNA-damaging properties of ethylene oxide exposure have been studied continuously since the 1940s.

65. In a 1977 report, the National Institute for Occupational Safety and Health ("NIOSH") concluded that occupational exposure to EtO may increase the frequency of mutations in human populations. NIOSH recommended that EtO be considered mutagenic and potentially carcinogenic to humans.

66. In 1981, NIOSH released a new bulletin focusing on new evidence of carcinogenic, mutagenic, and reproductive hazards associated with EtO. It also reiterated that EtO was a potential occupational carcinogen and reported that no safe levels of EtO exposure had been demonstrated.

67. Ethylene oxide has been on the EPA's TRI toxic chemical list since the list's inception in 1987. 40 C.F.R. § 372.65.

68. Ethylene oxide was first listed in the Fourth Annual Report on Carcinogens in 1985 as reasonably anticipated to be a human carcinogen. That listing was revised to be a "known human carcinogen" in the Ninth Report on Carcinogens in 2000 and has remained since.

69. IARC has conducted consecutive evaluations of the carcinogenicity of ethylene oxide to humans for decades.

70. The classification for EtO was upgraded to "carcinogenic to humans (Group 1)" in 1994.[25] This is the highest/most supported classification of a chemical as a carcinogen available to the world's most trusted source of cancer research.

71. The upgraded classification was confirmed by IARC Working Groups in 2008[26] and 2012[27].

72. In 2016, the EPA's Integrated Risk Information System (IRIS) increased the previously set cancer potency of EtO by 30 times, and 60 times for children.

73. The Federal Occupational Safety and Health Administration ("OSHA") classifies EtO as "Highly Hazardous Chemicals, Toxics and Reactives."

74. Chronic inhalation exposure to EtO has been linked to adverse reproductive health effects. Epidemiological studies have explored potential associations between EtO exposure and spontaneous abortion. For example, a study of 1,443 sterilizer workers in Finland found that workers exposed to EtO during pregnancy had over 3x higher rate of spontaneous abortion (15.1%) compared to those not exposed (4.6%). Similarly, other studies reported elevated risks

---

[25] International Agency for Research on Cancer. IARC monographs on the evaluation of carcinogenic risks to humans, volume 60. Some industrial chemicals. Lyon, France: IARC; 1994. Available from: https://publications.iarc.fr/78

[26] International Agency for Research on Cancer. IARC monographs on the evaluation of carcinogenic risks to humans, volume 97. 1,3-Butadiene, ethylene oxide and vinyl halides (vinyl fluoride, vinyl chloride and vinyl bromide). Lyon, France: IARC; 2008. Available from: https://publications.iarc.fr/Book-And-Report-Series/Iarc-Monographs-On-The-Identification-Of-Carcinogenic-Hazards-To-Humans/1-3-Butadiene-Ethylene-Oxide-And-Vinyl-Halides-Vinyl-Fluoride-Vinyl-Chloride-And-Vinyl-Bromide--2008

[27] International Agency for Research on Cancer. IARC monographs on the evaluation of carcinogenic risks to humans, volume 100F. A review of human carcinogens. Chemical agents and related occupations. Lyon, France: IARC; 2012. Available from: https://publications.iarc.fr/Book-And-Report-Series/Iarc-Monographs-On-The-Identification-Of-Carcinogenic-Hazards-To-Humans/Chemical-Agents-And-Related-Occupations-2012

of spontaneous abortion, preterm birth, and post-term birth among female dental assistants and sterilizer workers.[28]

75. In addition to human studies, experimental animal research supports the potential reproductive toxicity of EtO. Furthermore, male reproductive toxicity, including reduced sperm count and testicular damage, has been observed following exposure to EtO vapor in rats and monkeys.[29]

76. EPA has concluded that EtO is carcinogenic to humans by inhalation exposure. The stated confidence in this classification is "HIGH."

77. In addition to the increased cancer potency estimate, the 2016 IRIS assessment also included an adjustment for early life sensitivity to EtO. The EPA estimated that individuals exposed to EtO during early life (e.g., children) may experience higher cancer risks than adults.[30]

78. In identifying ethylene oxide as carcinogenic to humans (Group 1), the IARC Working Group (2012) also relied on mechanistic data.

79. The United States National Toxicology Program (National Toxicology Program 2014) and the EPA emphasize the importance of data on mechanistic pathways (by which agents may act as carcinogens) in cancer risk assessments (EPA 2005) (Krewski et al., 2019). [31]

---

[28] Agency for Toxic Substances and Disease Registry (ATSDR), Toxicological Profile for Ethylene Oxide (Aug. 2022), at 48–50, https://www.atsdr.cdc.gov/toxprofiles/tp137.pdf.

[29] *Id.*

[30] U.S. ENVTL. PROT. AGENCY, INTEGRATED RISK INFORMATION SYSTEM (IRIS) ASSESSMENT OF ETHYLENE OXIDE (2016),

https://cfpub.epa.gov/ncea/iris_drafts/recordisplay.cfm?deid=329730 (last visited Mar. 4, 2025)

[31] Krewski D, Bird M, Al-Zoughool M, Birkett N, Billard M, Milton B, Rice JM, Grosse Y, Cogliano VJ, Hill MA, Baan RA, Little J, Zielinski JM. Key characteristics of 86 agents known to cause cancer in humans. J Toxicol Environ Health B Crit Rev. 2019;22(7-8):244-263.

80. Electrophilic[32] properties and genotoxicity[33] are considered the most significant characteristics of a carcinogen (Smith et al., 2016).

81. There is strong evidence that ethylene oxide, a direct-acting alkylating agent, exerts its carcinogenic effects by a genotoxic mechanism. A dose-related increase in the frequency of ethylene oxide-derived hemoglobin adducts was demonstrated in exposed humans and rodents, and a dose-related increase in the frequency of ethylene oxide-derived DNA adducts was seen in exposed rodents. Ethylene oxide acted as a mutagen and clastogen at all phylogenetic levels; it induced heritable translocations in germ cells of rodents, a dose-related increase in sister chromatid exchanges, chromosomal aberrations and micronucleus formation in lymphocytes of exposed workers.

82. A recent IARC Monographs Programme analysis examined mechanistic data from the IARC Monographs for 86 Group 1 human carcinogens, identifying genotoxicity as the most common mechanistic characteristic of ethylene oxide.

---

[32] Electrophilic (electron-seeking) properties of a chemical is the most significant characteristic of carcinogen. Electrophilic molecules are commonly form addition products, generally referred to as adducts, with DNA, RNA and proteins. Some chemical carcinogens belong to the direct-acting electrophiles (e.g., ethylene oxide, formaldehyde, sulfur mustard), whereas others (e.g. polycyclic aromatic hydrocarbons and benzene) require metabolic activation / biotransformation by enzymes to ultimate carcinogenic and reactive forms (Miller, 1970).

[33] The term "genotoxic" refers to an ability of agent to induce DNA damage in the form of DNA adducts, single- or double-strand breaks, oxidized or fragmented nucleotide bases, covalent binding to the bases. The DNA damage generally does not alter the linear sequence of nucleotides (or bases) in the DNA. Gene mutation is defined as a change in the normal nucleotide DNA sequence, which usually arises as the cell attempts to repair the DNA damage and may have a central role in human carcinogenesis (Ding et al., 2008). Clastogenic effects refers to damage to chromosomes, including DNA breakage, or the rearrangement, gain, or loss of chromosome fragments (Snyder 2010).

83. Further, some carcinogens (e.g., ethylene oxide), which do not require metabolic activation or modification to induce cancer, are called direct-acting or activation-independent carcinogens.

84. Usually, existing as highly reactive electrophilic molecules, direct-acting carcinogens directly interact with and bind to cellular macromolecules, including DNA. Due to this high reactivity, direct-acting carcinogens frequently result in tumour formation at the site of chemical exposure. Such carcinogens and their DNA reactive metabolites are classically considered to represent risk factors at all concentrations since even one or a few DNA lesions, according to the concept of a non-threshold mode of action, which may, in principle, result in mutations and, thus, increase tumour risk (Hartwig et al., 2020).[34]

85. In general, genotoxic carcinogens, especially direct mutagens like EtO, due to their DNA interaction properties, exert their effects even at extraordinarily low dosages.[35]

---

[34] Hartwig A, Arand M, Epe B, Guth S, Jahnke G, Lampen A, Martus HJ, Monien B, Rietjens IMCM, Schmitz-Spanke S, Schriever-Schwemmer G, Steinberg P, Eisenbrand G. (2020) *Mode of action-based risk assessment of genotoxic carcinogens*. Archives of Toxicology. 94, 1787-1877.

[35] Research suggests EtO has a currently undetectably low minimal dose required for effect ("no-threshold effect"). See Aoki Y. (2016) *Possible Determinant of the Threshold for Carcinogenesis*. In: Thresholds of Genotoxic Carcinogens from Mechanisms to Regulation. Eds: Takehiko Nohmi and Shoji Fukushima. Tokyo. Academic Press is an imprint of Elsevier. pp.155-170.

86. The 2022 Safety Data Sheet on EtO by a prominent supplier of the compound, ARC, includes

the following hazard labeling:



HAZARD RATINGS: (0 = minimum; 4 = maximum)

HMIS Rating:    Health = 3
                Flammability = 4
                Reactivity = 3
                Personal Protection Code = X
                (Consult your supervisor or standard
                operating procedures for special
                handling directions.)

NFPA Rating:    Health = 3
                Flammability = 4
                Reactivity = 3

87. Defendants' emission levels rival even the largest industrial facilities and sterilization plants

in the country, and in 2022, the Facility emitted the 12th most EtO of any facility in the US out

of more than 250. Most of the higher-emitting facilities can be found in rural areas with

appreciably lower populations than Kansas City, making this Facility a unique threat to broader

public health.

88. Although short of its historic peak, the Facility consistently emitted over 3,400 pounds per year from 2020 to 2022.[36]

89. As a direct and proximate result of Defendants' dangerous emissions of EtO and other toxic chemicals over more than half a century, this community has endured unnecessary suffering, and many have lost their lives to preventable causes. These outcomes are the foreseeable and avoidable consequences of Defendants' conscious disregard and reckless indifference to the health, safety, and well-being of those in this community.

90. Despite knowing the risks, Defendants continued to use and emit grossly unsafe quantities of EtO and other toxic chemicals, directly causing harm to the Named Plaintiffs and Class members.[37] This reckless conduct has significantly harmed the health and well-being of the community, with Defendants' actions being a proximate cause of the injuries sustained by those affected.

## ENVIRONMENTAL (IN)JUSTICE

91. This case does not occur in isolation; rather, it reflects systemic environmental injustice, wherein historically marginalized communities have been disproportionately burdened by the consequences of corporate greed.

---

[36]Retrieved and downloaded from
https://enviro.epa.gov/triexplorer/release_fac_profile?TRI=66106HRCRS5200S&TRILIB=TRIQ1&V_N
A_INDICATOR=.&FLD=&FLD=RELLBY&FLD=TSFDSP&OFFDISPD=&OTHDISPD=&ONDISPD
=&OTHOFFD=&YEAR=2021

[37] TRI reporting for the over 30-indexed toxins since 1988 are available at the link in footnote 19, and that list of chemicals is incorporated by reference herein—for the purposes of judicial economy, and in defining "other toxic chemicals" referenced throughout the complaint. Other chemicals, particularly those predating 1988, are referenced throughout the Party section by Defendant Group.

92. Defendants have prioritized profits over people, knowingly exposing vulnerable residents to hazardous emissions that have devastating health consequences. This lawsuit seeks not only justice for those harmed but also aims to hold the Defendants accountable for their reckless disregard for human life and to prevent further exploitation of these communities. The core purpose of damages here, including punitive damages, aligns with the purpose of common law itself—to compensate and deter.

93. The Class consists of overlapping communities that are primarily Black and Hispanic, with a high proportion living below the poverty line, and educational attainment levels that fall below the state median. Further contextualized by the historically racially discriminatory redlining policies in the county and Kansas City, Missouri, throughout much of the 20th century, this matter is a prime case study in systemic environmental injustice.

94. In 2016, researchers from The Ohio State University published a report on the poor state of public health and environmental justice concerns in Wyandotte County. [38]  It found, among other things:

    a. According to the annual County Health Rankings published by the Robert Woods Foundation, Wyandotte County, Kansas, consistently ranks last among the state's 105 counties for social determinants of health.

    b. Historical maps and documents of the impacted area demonstrate long-term neighborhood disinvestment, rooted in discriminatory housing policies, that spans

---

[38] *See,* Health Equity Action Transformation (H.E.A.T.) Report, Health Equity Action Transformation: A Community Health Assessment of Wyandotte County, Kansas (2016), https://wearewyandotte.com/wp-content/uploads/2016/12/CHC_HeatReport_1130.pdf. (last accessed Mar. 4, 2025).

decades. Unsurprisingly, these historically divested neighborhoods are the same areas that experience the worst health outcomes today.

c. Relevant data of clustered areas characterized by high rates of heart disease and cancer point to cumulative stressors beyond genetics and personal choice as detriments to good health and long life. **Disturbingly, the average age at death in the vicinity of the facility is approximately 20 years lower than the average observed in the same county just a few miles west.[39]**

d. Depressed housing stock is also located in proximity to areas near the Kansas and Missouri Rivers, where Defendants' facility is located, presenting health risks due to potential toxic exposures. Two of the Census Tracts closest to this area have the highest cancer death rates in Wyandotte County, which, itself, has among the worst cancer rates for the forms of cancer relevant to this matter in Kansas and the US.

95. Relevant literature on environmental justice has developed in the last 30+ years and its insights have become more readily known, including findings which add necessary context to this matter and why this aggregate litigation must be brought:

a. In Marianne Lavelle & Marcia Coyle, *Unequal Protection: The Racial Divide in Environmental Law*, Nat'l L.J., Sept 21 1992, the researchers studied the interaction

---

[39] *Id.* at 24 ("length of life varies dramatically from one part of Wyandotte County to another. In many central Kansas City [Kansas] neighborhoods, the average age of death ranges approximately 59-62 years. In neighborhoods just a few miles to the west, the average age at death ranges from 71-81—a difference of as much as 20 years.")

between race and the EPA's enforcement of environmental laws and regulations. They found that:

    i.   Penalties for fractions under hazardous waste laws in sites near white populations were roughly six times higher than penalties at sites with largest minority populations;

    ii.   This disparity in penalties assessed under toxic waste law occurs by race alone rather than class, as the average mentalities based in median income showed little fluctuation between low and high income;

    iii.   Enforcement penalties for air/ water/waste pollution in white communities were 46% higher than in minority communities;

    iv.   Abandoned hazardous waste sites in primarily minority areas waited 20% longer to be placed on EPA's national priority list under CERCLA than those in primarily white areas;

    v.   CERCLA cleanup began from 12%-42% later in primarily minority sites than white sites across most EPA regions.

b.  In Lesley Fleischman and Marcus Franklin, *Fumes Across the Fence-line – The Health Impacts of Air Pollution From Oil and Gas Facilities in African American Communities*, from 2017, the authors explain the staggering facts that black Americans are exposed to 38% more contaminated air and are 75% more likely than white Americans to live in a "fence-line" community, like those impacted in this matter.

c.  In Christopher W. Tessum et. al., *Inequity in consumption of goods and services adds a racial-ethnic disparities in air pollution exposure*, 115 Proc. Nat'l Academy of Scis

6001 (2019), researchers discussed the market-trend link between the majority white-population's disproportionately larger purchasing of the exact goods that cause air pollution, uniquely impacting black and Hispanic fence line populations. Put differently, not only are black and Hispanic fence line communities facing the inequitable brunt of American industrial hazardous emissions but do so while enjoying disproportionately less of the spoils of the goods produced by those industries. Neither having their cake nor eating it.

 d. In March 2007, the United Church of Christ Justice and Witness Ministries published a 20-year student titled "*Toxic Wastes and Race in Twenty: 1987-2007 Grassroots Struggles to Dismantle Environmental Racism in the United States*" which found that race is an independent predictor of where hazardous wastes are located and is a stronger single-variable predictor than income, education, and other socioeconomic indicators.

96. This pattern is further contextualized by Defendants' histories and origins, as previously discussed.

## CLASS ACTION ALLEGATIONS

97. Plaintiffs restate and incorporate by reference the allegations in the preceding paragraphs, as though fully set forth herein, in support of the following class action allegations.

98. Plaintiffs seek to pursue claims for relief via Rule 23(c)(4) of the Federal Rules of Civil Procedure as representatives of an issue-class of individuals with chronic injuries proximately caused by the Defendants' actions and omissions regarding emissions of EtO and other toxic chemicals as alleged herein from the first emissions to a final resolution in this matter, as defined more fully below:

All individuals who have resided, worked full time, and/or attended school (PreK-12 and/or full-time college enrollment) within a 2.5-mile radius of 5200 Speaker Rd Kansas City, KS 66106, beginning the first date operation of the Facility [December, 1960], with one year or more of exposure, and who have been diagnosed with one or more of the following conditions before final resolution in this matter:

1. Breast Cancer;
2. Blood Cancers (including but not limited to leukemia, lymphoma, multiple myeloma);
3. Lung Cancer;
4. Liver Cancer; or
5. Miscarriages/Female Reproductive System Cancer.[40]

99. Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their immediate families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and its officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

100. The class vehicle is proper in this matter because (1) the class is so numerous that joinder of all members is impracticable; (2) there are substantial questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses

---

[40] To the extent the Court finds it fair, just, and expedient to—rather than choosing not to certify the Class due to the number of chronic injuries currently at issue—break the Class into subclasses, separated by injury. Plaintiffs encourage such judicial management of this case to continue with the advantages of the Class vehicle with perhaps greater specificity by injury group.

of the class; and (4) the representative parties will fairly and adequately protect the interest of the class.

101. Membership in these classes is so numerous that joinder is impractical. Although the exact number and identities of class members are currently unknown and can only be ascertained through appropriate discovery, the Plaintiff estimates and believes the proposed Class has more than 300 members.

102. The claims of the named Plaintiffs and other class members are typical of the claims for all the class members, as all members sustained substantially similar injuries, including but not necessarily limited to those injury groups for which the Named Plaintiffs are representative members. Defendants' practices, as described in the factual allegations above, affected the class members similarly—namely, by unjustly exposing class members to unsafe toxic emissions.

103. Named Plaintiffs will fairly and adequately protect the interests of the class members, who are victims of the Defendants' acts and omissions and have no interest antagonistic to those of the class members.

104. Named Plaintiffs have retained an international plaintiff class action and mass tort law firm, experienced in prosecuting complex civil litigation, which is well-suited to litigate this matter alongside their exceptionally capable local and co-counsel, a renowned mass tort firm. [41]

105. There are various shared questions of law and fact arising from Defendants' conduct, making this an appropriate case for resolution utilizing a class action. The common issues include, but are not limited to, the following:

---

[41]See generally, https://milberg.com/,  https://krauseandkinsman.com/.

a.  What total amount of EtO and other toxic chemicals have been emitted into the community impacted by the Facility since it started operations in December 1960, and with what regularity, and thus the possible exposure amounts for members of the Class;

b.  Whether Defendants' conduct towards the Class was negligent, grossly negligent, or subject to strict liability for the emission of toxins as Abnormally Dangerous Activity(s);

c.  Whether General Causation exists for one or more of the Chronic Injuries alleged herein.

d.  Whether Defendants owed a duty of care to Class members;

e.  Whether the duty of care owed to the class included the duty to protect against exposure to injuriously high levels of toxic emissions;

f.  Whether Defendants breached a duty to warn the Class of and protect the Class from health risks and consequences of acute and chronic exposure to toxic emissions;

g.  Whether class members have a right to actual, statutory, treble, and punitive damages, injunctive or equitable relief;

h.  Whether all Defendants are liable, to what extent they are liable, and

i.  Whether class members are entitled to attorney fees;

106. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, given that:

a.  Common questions of law and fact predominate over individual questions that may arise, such that there would be efficiencies in litigating the common issues class-wide instead of on a repetitive, individual basis;

b.  A class action is required for optimal deterrence, optimal compensation, and to limit the court-awarded reasonable legal expenses incurred by Class Members;

c.  Should the individual class members be required to bring separate actions in full, Courts would be confronted by a multiplicity of encumbering and duplicative lawsuits, thus burdening the fair and just administration of justice. This creates an unreasonable and unnecessary risk of inconsistent rulings and contradictory judgments. In contrast to beginning on a case-by-case basis, which would result in inconsistent results that would magnify the delay and expense to all parties and the Court system, this issue class action will present fewer management difficulties while providing unitary adjudication on all common issues, offering economies of scale, and comprehensive supervision by a single Court.

107. Defendants' conduct concerning the named plaintiffs and class members has been uniform. Defendants treated each of the Class Members comparably—and with comparable disregard. Defendants did not act with individualized particularity concerning these allegations, but rather with a generalized reckless disregard for the health and well-being of the entire impacted community—the entire class.

## COUNT I
### Strict Liability – Abnormally Dangerous Activities
### (Against Each Defendant Individually and Collectively)

108. Plaintiffs restate and incorporate paragraphs 1 through 107 by reference as if fully set forth herein.

109. EtO and other toxic chemicals emitted from the Facility are abnormally dangerous due to their high toxicity and volatility, the significant risk of harm they pose to individuals, and the severity of the resulting health effects.

110. Defendants' unreasonably dangerous volumes of toxic emissions are particularly unsuited and inappropriate to their location, which is surrounded by residential neighborhoods, schools, municipal buildings, churches, and parks, where exposure poses a heightened risk to the community.

111. The Facility's operations produce unsafe emission levels, and Defendants have not demonstrated a capacity to emit these toxins safely in this setting.

112. Accordingly, Defendants' historic and ongoing use and emissions of carcinogenic and toxic chemicals from the Facility constitute either an abnormally dangerous activity or a series of abnormally dangerous activities.

113. Defendants' emissions have created and continue to create an abnormally high degree of risk to those who live(d), attend(ed) school, and work(ed) in the surrounding area.

114. Defendants engaged in abnormally dangerous activities, including the transportation, transfer, handling, processing, and emission of ethylene oxide (EtO) and other toxic chemicals from a facility that is improperly located. As a result, they can be held liable for any harm caused to the Plaintiffs and the Class due to these hazardous activities, even if the Defendants took every possible precaution to prevent the dangerous emission levels of these toxic substances.

115. As a direct and proximate result of Defendants' abnormally hazardous activities, Plaintiffs and class members were repeatedly and/or continually exposed to EtO and other toxic chemicals while living, working, or attending school in the affected community.

116. As a direct and proximate result of being exposed to EtO and other toxic chemicals from the Facility, Plaintiffs and class members have suffered severe and/or permanent injuries, including but not limited to:

    a.   Toxic exposure and related health complications;

    b.   Personal injury and medical conditions associated with exposure to EtO and other toxic chemicals;

    c.   Significant medical expenses (both past and future)

    d.   Lost wages and diminished earning capacity;

    e.   Severe emotional distress and mental anguish;

    f.   Chronic pain and suffering;

    g.   Physical disability, disfigurement and reduced life expectancy;

    h.   Enhanced risk of future disease; and

    i.   Loss of enjoyment of life and diminished quality of life.

## COUNT II
### Gross Negligence—Willful, Wanton, or Reckless Conduct
### (Against Each Defendant Individually and Collectively)

117. Plaintiffs restate and incorporate paragraphs 1 through 107 by reference as if fully set forth herein.

118. Defendants had, and continue to have, a duty to refrain from willful, wanton, and/or reckless conduct that demonstrates a conscious disregard for, or reckless indifference to the rights, health, safety, and well-being of Plaintiffs and class members who live, work, or attend school in the area surrounding the Facility.

119. At all relevant times, the Defendants were aware that hazardous chemicals emitted from the facility would have toxic, poisonous, and severely harmful effects on the health, safety, and well-being of the Plaintiffs and the Class. Despite this knowledge, the Defendants continued their emissions without implementing necessary safeguards and failed to disclose the extent of the risk to those exposed.

120. In the alternative and even if absent actual knowledge, Defendants should have been aware that hazardous chemicals emitted from the facility would have toxic, poisonous, and severely harmful effects on the health, safety, and well-being of the Plaintiffs and the Class.

121. The defendants exhibited gross negligence, extreme carelessness, and willful misconduct, breaching their duty through reckless, willful, and/or wanton actions in one or more of the following ways:

   a. By knowingly and continuously emitting EtO and other toxic chemicals into the air from the Facility;

   b. By emitting uncontrolled, excessive, unnecessary, and/or unregulated volumes of EtO and other toxic chemicals into the air from the Facility.

   c. By emitting dangerous quantities of EtO and other toxic chemicals as part of its manufacturing process, despite readily available and economically feasible safer

alternatives and methodologies that could accomplish the same or similar business purpose without presenting the same unjust risk to human health and well-being.

    d.  By unjustly placing its own economic interests and corporate profits above the health and well-being of those in the impacted community;

    e.  By failing to warn or advise Plaintiffs, as well as those in the impacted community, that they were being unknowingly and involuntarily exposed to EtO and other toxic chemicals;

    f.  By failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate toxin emissions—both typically-monitored and fugitive emissions—from the Facility;

    g.  By failing to properly and transparently study and test the effect of emissions from its Facility adequately—both typically monitored and fugitive emissions—on the quality of air and its long-term health impacts on the community; and/or

    h.  By recklessly subjecting Plaintiffs and those in the impacted community near the facility to elevated, and preventable, cancer risk.

122. As a foreseeable, direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and class members were unknowingly and involuntarily exposed to and inhaled, and continue to be exposed to and inhale, dangerous amounts of EtO and other toxic chemicals emitted from the Defendants' facility at levels known to cause severe and permanent harm.

123. As a foreseeable, direct and proximate result of Plaintiffs' and class members' inhalation of toxic emissions from the facility, they have developed the herein alleged injuries, which have caused and will continue to cause Plaintiffs and class members to suffer severe and permanent harm, including but not limited to:

a.  Toxic exposure and related health complication(s);

b.  Personal injury and medical conditions associated with exposure to EtO and other toxic chemicals;

c.  Significant medical expenses (both past and future)

d.  Lost wages and diminished earning capacity;

e.  Severe emotional distress and mental anguish;

f.  Chronic pain and suffering;

g.  Physical disability, disfigurement and reduced life expectancy;

h.  Enhanced risk of future disease; and

i.  Loss of enjoyment of life and diminished quality of life.

## COUNT III
### Negligence
### (Against Each Defendant Individually and Collectively)

124. Plaintiffs restate and incorporate paragraphs 1 through 107 by reference as if fully set forth herein.

125. Defendants owned, operated, managed, controlled, and supervised the Facility during a material and substantial period, including key years when emissions were at hazardous levels, since 1961.

126. Defendants had and/or continue to have a duty to exercise reasonable and ordinary care for the health, safety, and well-being of Plaintiffs and all individuals who live, worship, attend school, or work in the area surrounding the Facility.

127. At all relevant times, Defendants knew or had reason to know, or willfully ignored evidence that the EtO and other toxic chemicals emitted from the Facility posed a grave, foreseeable, and unavoidable risk to the health, safety, and well-being of those exposed.

128. Defendants were aware of regulatory warnings, industry studies, and other available data confirming the toxicity of their emissions but failed to take appropriate corrective action.

129. Defendants breached their duty and failed to exercise ordinary care for the health and well-being of Plaintiffs in one or more of the following ways:

    a.  By knowingly and continuously emitting EtO and other toxic chemicals into the air from the Facility;

    b.  By emitting uncontrolled, excessive, unnecessary, and/or unregulated volumes of EtO and other toxic chemicals into air from the Facility.

    c.  By emitting dangerous quantities of EtO and other toxic chemicals as part of its manufacturing process, despite readily available and economically feasible safer alternatives that could accomplish the same or similar business purpose without presenting the same level of risk to human health and well-being.

    d.  By unjustly placing its own economic interests and corporate profits above the health and well-being of those in the impacted community;

    e.  By failing to warn or advise Plaintiffs, as well as those in the impacted community, that they were being unknowingly and involuntarily exposed to EtO and other toxic chemicals;

    f.  By failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate toxin emissions—both typically-monitored and fugitive emissions—from the Facility;

    g.  By failing to properly and transparently study and test the effect of emissions from its Facility adequately—both typically monitored and fugitive emissions—on the quality of air and its long-term health impacts on the community; and/or

    h.  By recklessly subjecting Plaintiffs and those in the impacted community near the facility to elevated, and preventable, cancer risk.

130. As a foreseeable, direct and proximate result of one or more of the foregoing acts or omissions, Plaintiffs and class members were unknowingly and involuntarily exposed to hazardous levels of toxins, known carcinogens, and DNA mutagens.

131. As a direct and proximate result of Plaintiffs' and class members' inhalation of toxic emissions from the facility, they have suffered severe and permanent harm, including but not limited to:

    a.  Toxic exposure and related health complication(s);

    b.  Personal injury and medical conditions associated with exposure to EtO and other toxic chemicals;

    c.  Significant medical expenses (both past and future)

    d.  Lost wages and diminished earning capacity;

    e.  Severe emotional distress and mental anguish;

    f.  Chronic pain and suffering;

g.  Physical disability, disfigurement and reduced life expectancy;

h.  Enhanced risk of future disease; and

i.  Loss of enjoyment of life and diminished quality of life.

### COUNT IV
### Negligent Construction, Repair, and Maintenance
### (Against Each Defendant Individually and Collectively)

132. Plaintiffs restate and incorporate paragraphs 1 through 107 by reference as if fully set forth herein.

133. Throughout their time as owners, operators, tenants, landlords, or managers of the Facility, Defendants knew or should have known that the chemicals they emitted were/are dangerous, highly explosive, toxic, carcinogenic, mutagenic, and the cause of various severe and life-threatening illnesses through inhalation exposure.

134. Throughout their time as owners, operators, tenants, landlords, or managers of the Facility, Defendants were aware of the industrial operations conducted at the Facility, including the use and emission of EtO and other toxic chemicals resulting from those operations. They knew or should have known of the serious health risks these chemicals posed to the surrounding community.

135. Emissions could have been substantially reduced if the buildings and infrastructure had been constructed and/or modified, upgraded, or improved in accordance with recognized "high-hazardous" occupancy standards.

136. Throughout their time as owners, operators, tenants, landlords, or managers of the Facility, Defendants maintained sufficient control over the premises to be liable to Plaintiffs for the

disrepair, faulty construction, and negligent maintenance and supervision of the Facility and its premises.

137. The exterior walls, interior walls, ceiling, roof, bay doors, piping, building insulation, ventilation systems, air filtration systems, containment systems, and other non-trade fixture parts of the facility are, on information and belief, among the aspects of the Facility that are negligently constructed, repaired, and maintained.

138. Defendants had a non-delegable duty to ensure the facility was constructed, maintained, and repaired in a sufficient manner, which they knew or should have known had been used since 1961 to store and use abnormally dangerous chemicals.

139. Throughout their time as owners, operators, tenants, landlords, or managers of the Facility, Defendants negligently failed to exercise due care in the construction, repair, maintenance, and supervision of the Facility where Defendants manufactured chemicals. As a result, Defendants caused substantial harm to Plaintiffs and class members and thus are liable for all resulting damages.

140. As a direct and proximate result of Plaintiffs' and class members' exposure to EtO and other toxic chemicals emitted from the Facility, they have suffered severe and permanent harm, including but not limited to:

   a. Toxic exposure and related health complication(s);

   b. Personal injury and medical conditions associated with exposure to EtO and other toxic chemicals;

   c. Significant medical expenses (both past and future)

   d. Lost wages and diminished earning capacity;

e.   Severe emotional distress and mental anguish;

f.   Chronic pain and suffering;

g.   Physical disability, disfigurement and reduced life expectancy;

h.   Enhanced risk of future disease; and

i.   Loss of enjoyment of life and diminished quality of life.

### COUNT V
### Wrongful Death
### (Against Each Defendant Individually and Collectively)

141. Plaintiffs restate and incorporate paragraphs 1 through 107 by reference as if fully set forth herein.

142. Plaintiff Diane Woods is proceeding in this matter as a named Plaintiff, individually and as the representative of the Estate of her late father, Cecil McBee.

143. At all relevant times, Defendants knew or should have known that their emissions of Ethylene Oxide (EtO) and other toxic chemicals from the Facility posed a severe risk of life-threatening illnesses, including fatal cancers and other terminal diseases.

144. Defendants owed a duty of care to the decedent and all similarly situated Chronic Injury Class Members to prevent, minimize, and adequately warn of the health risks associated with prolonged exposure to EtO and other toxic chemicals.

145. Defendants breached their duty through reckless, willful, and/or grossly negligent conduct, including but not limited to:

a.   By knowingly and continuously emitting EtO and other toxic chemicals into the air from the Facility;

b.  By emitting uncontrolled, excessive, unnecessary, and/or unregulated volumes of EtO and other toxic chemicals into air from the Facility.

c.  By emitting dangerous quantities of EtO and other toxic chemicals as part of its manufacturing process, despite readily available and economically feasible safer alternatives and methodologies that could accomplish the same or similar business purpose without presenting the same level of risk to human health and well-being.

d.  By unjustly placing their economic interests and corporate profits above the health and well-being of those in the impacted community;

e.  By failing to warn or advise Plaintiffs, as well as those in the impacted community, that they were being unknowingly and involuntarily exposed to EtO and other toxic chemicals;

f.  By failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate toxin emissions—both typically-monitored and fugitive emissions—from the Facility;

g.  By failing to properly and transparently study and test the effect of emissions from its Facility adequately—both typically monitored and fugitive emissions—on the quality of air and its long-term health impacts on the community; and/or

h.  By recklessly subjecting Plaintiffs and those in the impacted community near the facility to elevated, and preventable, cancer risk.

146. As a direct and proximate result of Defendants' wrongful conduct, Cecil McBee and numerous other Chronic Injury Class Members—represented by their Estates or other authorized representatives— developed fatal illnesses and suffered untimely deaths due to

cumulative, chronic exposure to EtO and other toxic chemicals, including in utero exposure where applicable, emitted by Defendants' Facility.

147. The Estate of Cecil McBee, along with similarly situated estates of other class members, has suffered substantial economic and non-economic damage, including but not limited to:

  a. Medical expenses incurred before death due to treatment for illnesses related to, or resulting from, exposure to EtO and other toxic chemicals;

  b. Funeral and burial expenses;

  c. Pre-death pain and suffering endured by the deceased;

  d. Loss of financial support and benefits to surviving family members;

  e. Loss of companionship, guidance, and emotional support to surviving family members;

  f. Loss of enjoyment of life and diminished quality of life suffered by the deceased prior to death; and

  g. Any other damages recoverable under applicable wrongful death and survival statutes

148. Diane Woods, on behalf of the Estate of her late father Cecil McBee and all similarly situated estate-administrator class members, respectfully requests that judgment be entered in their favor and against Defendants in an amount to be determined by the jury at trial, including but not limited to:

  a. Full compensatory damages

  b. Punitive damages or Treble damages, whichever is greater; and

  c. Any other relief deemed just and proper by the Court.

**COUNT VI**

**Punitive Damages**

**(Against Each Defendant Individually and Collectively)**

149. Plaintiffs restate and incorporate paragraphs 1 through 107 by reference as if fully set forth herein.

150. Defendants have a longstanding and disturbing history of unlawful releases and discharges of toxic substances from the Facility. The Facility's EPA risk score in 2021 was 6,470,152— equal to more than 2,700 median-risk facilities of the same sort. The Facility's EtO emissions continue to be among the highest in the country, ranking 12th in the U.S. in 2022. The reported emissions were comparable to or even exceeded those from major industrial and sterilization facilities, some of which the EPA has flagged for elevated cancer risks due to EtO exposure. Despite clear regulatory warnings and public health data, Defendants continued emitting toxic chemicals at dangerous levels.

151. Defendants are liable for punitive damages due to their deliberate, willful, wanton, and grossly negligent conduct, which demonstrates a conscious, reckless disregard and indifference to human life by knowingly emitting hazardous chemicals, including Ethylene Oxide (EtO), into the air for decades. This reckless pollution exposed thousands of residents, workers, students, and worshipers to highly toxic substances, resulting in severe, and in instances catastrophic, health conditions, including but not limited to:

   a. Elevated rates of cancer, including breast cancer, blood cancers, and lung cancer;

   b. Severe birth defects and developmental disorders caused by toxic exposure, including in utero exposure;

    c.   Respiratory illnesses, organ damage, and DNA mutations linked to long-term EtO exposure;

    d.   Enhanced risk of—and diminished capacity to fight—future disease; and

    e.   Increased mortality rates and reduced life expectancy among those exposed.

152. Defendants knew, or should have known, that their emissions posed an imminent and severe danger to the community surrounding their Facility. Yet, they concealed, misrepresented, or outright ignored scientific evidence, regulatory standards, and community health concerns.

153. Under Kansas law, punitive damages are recoverable to punish the wrongdoer(s) for malicious, vindictive, or willful, wanton invasion of another's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs. *Adamson v. Bicknell*, 287 P.3d 274 (Kan. 2012); *Hayes Sight and Sound, Inc. v. Oneok*, 136 P.3d 428, 452 (Kan. 2006).

154. Given the severity and duration of Defendants' misconduct, Plaintiffs seek punitive damages in an amount sufficient to punish and deter Defendants and other similarly situated entities from engaging in such reckless endangerment of human life.

## PRAYER FOR RELIEF

Plaintiffs are entitled to and pray for trial by jury on all issues.

      WHEREFORE, Plaintiffs, individually and on behalf of all those similarly situated, pray for the following:

    a.   That the Court certify this case as a Class Action under Rule 23 of the Federal Rules of Civil Procedure and designate Plaintiffs as representative parties;

    b.   That the Court appoint Plaintiffs' undersigned counsel as Interim Class Counsel under Rule 23(g);

c.      That the Court enter judgment awarding full compensatory damages to Plaintiffs and Class Members in an amount to be determined at trial, including but not limited to:

     i.    Medical expenses (past and future)

     ii.    Lost wages and diminished earning capacity;

     iii.    Pain and suffering, mental anguish, and emotional distress;

     iv.    Disability, disfigurement, and reduced life expectancy; and

     v.    All other damages recoverable under applicable law.

d.      That the Court enter judgment awarding punitive or trebled damages, whichever is greater, due to Defendants' willful, wanton, and reckless misconduct;

e.      That the Court grant equitable and injunctive relief as necessary;

f.      That the Court award pre-judgment and post-judgment interest at the maximum rates permitted by law;

g.      That the Court award Plaintiffs' reasonable attorneys' fees, litigation cost and expenses incurred in the prosecution of this action; and

h.      That the Court award all such other relief the Court deems proper.


Respectfully submitted by Plaintiffs' undersigned counsel.


Date: June 30, 2025


*/s/ Robert L. Kinsman*

Robert L. Kinsman (KS #26673)

Adam W. Krause (MO #67462)*

Taimi Pabon (PR # 22,823)*

KRAUSE & KINSMAN GROUP, LLC

93 Francisco Escudero #1002

Dorado, Puerto Rico 00646

P: (816) 760-2700

F: (816) 760-2800

robert@krauseandkinsman.com

adam@krauseandkinsman.com

tpabon@krauseandkinsman.com

www.krauseandkinsman.com

* *pro hac vice forthcoming*

Joanna Orscheln (KS #27766)*
Monet Duke (IL #6305774 )*
KRAUSE & KINSMAN, LLC
4717 Grand Ave., Suite 300
Kansas City, MO 64112
P: (816) 760-2700
F: (816) 760-2800
joanna@krauseandkinsman.com
mduke@krauseandkinsman.com
www.krauseandkinsman.com
* *pro hac vice forthcoming*

and

MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, LLC

Marc D. Grossman*
Luis V. Almeida-Olivieri*
1311 Ponce de León Ave. Suite 600
San Juan, PR 00907
Tel.: 866-252-0878
mgrossman@milberg.com
lalmeida@milberg.com
* *pro hac vice forthcoming*

Melissa K. Sims*
John M. Restaino, Jr.*
800 South Gay Street, Suite 1100
Knoxville, Tennessee 37929
Tel.: 866-252-0878
msims@milberg.com
jrestaino@milberg.com
* *pro hac vice forthcoming*

Nevin Wisnoski*
900 West Morgan Street
Raleigh, North Carolina 27603
Tel.: 866-252-0878
nwisnoski@milberg.com
* *pro hac vice forthcoming*