**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **ELLSWORTH WILLIAM JEFFERIES III, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 25-2352-KHV** |
| **HARCROS CHEMICALS INC. et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

On October 10, 2025, plaintiffs filed their First Amended Class Action Complaint (Doc. #73). Plaintiffs (individually, and on behalf of those similarly situated ("the class")), allege that defendant's facility at 5200 Speaker Rd in Kansas City, Kansas exposed the surrounding community to carcinogens which injured them. Plaintiffs are Ellsworth William Jeffries III, Rocky Garner, the estate of Weston T. Lawson, Jose L. Ramirez Jr., Kenique Smith, Estelle White and Diane L. Woods, individually and as administrator of the estate of Cecil B. McBee. Plaintiffs allege that Harcros Chemicals Inc., Philips Electronics North America, Koninklijke Philips N.V., Elementis Chemicals, Inc. and Elementis PLC, owned and/or operated the facility from 1961 to the present. Plaintiffs assert tort claims under Kansas law, including strict liability for abnormally dangerous activities, gross negligence, negligence, negligent construction, wrongful death and failure to warn. This matter comes before the Court on the Motion To Dismiss For Failure To State A Claim (Doc. #85) which Harcros filed October 31, 2025.

Plaintiffs sue individually and as representatives of an issue class of "all individuals who have resided, worked full time, and/or attended school (PreK-12 and/or full-time college enrollment) within a 2.5-mile radius of 5200 Speaker Rd Kansas City, KS 66106, beginning the

first date operation of the facility (December, 1960), with one year or more of exposure, and who have been diagnosed with one or more of the following conditions before final resolution in this matter: breast cancer, blood cancers (including but not limited to leukemia, lymphoma, multiple myeloma), lung cancer, liver cancer, miscarriages (including but not limited to recurrent pregnancy loss (RPL)) or female reproductive system cancers." Id., ¶ 163. Harcros seeks to dismiss the claims of named plaintiffs.[1] For reasons below, the Court sustains Harcros' motion in part.

### Legal Standard

In ruling on a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement of relief. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible—not merely conceivable—on its face. Id. at 679–80; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In determining whether a complaint states a plausible claim for relief, the Court draws on its judicial experience and common sense. Iqbal, 556 U.S. at 679. The Court need not accept as true those allegations which state only legal conclusions. See id.

Plaintiffs bear the burden of framing their claims with enough factual matter to suggest that they are entitled to relief; it is not enough to make threadbare recitals of a cause of action accompanied by conclusory statements. See Twombly, 550 U.S. at 556. Plaintiffs make a facially plausible claim by pleading factual content from which the Court can reasonably infer that defendant is liable for the misconduct alleged. Iqbal, 556 U.S. at 678. Plaintiffs must show more than a sheer possibility that defendant has acted unlawfully—it is not enough to plead facts that are "merely consistent with" defendant's liability. Id. (quoting Twombly, 550 U.S. at 557). A

---

[1]    It does not challenge the claims of putative class members.

pleading which offers labels and conclusions, a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement will not stand.  Iqbal, 556 U.S. at 678.  Similarly, where the well-pleaded facts do not permit the Court to infer more than the mere possibility of misconduct, the pleading has alleged—but has not "shown"—that the pleader is entitled to relief.  See id. at 679.  The degree of specificity necessary to establish plausibility and fair notice depends on context because what constitutes fair notice under Rule 8(a)(2), Fed. R. Civ. P., depends on the type of case.  Robbins v. Oklahoma, 519 F.3d 1242, 1248 (10th Cir. 2008) (citing Phillips v. Allegheny, 515 F.3d 224, 232–33 (3d Cir. 2008)).

### Factual Background

Plaintiffs' First Amended Complaint (Doc. #73) alleges as follows:

Since construction in December of 1960, defendants have knowingly emitted dangerous quantities of neurotoxins, endocrine disruptors, DNA mutagens and human carcinogens into the air of Kansas City, Kansas, thereby contaminating the community which surrounds their facility. Id., ¶ 11.  Despite predictable dangers to human health and safety, defendants unjustifiably allowed these emissions, causing substantial harm to individuals who inevitably inhaled dangerously elevated levels of toxic chemicals, often for their entire lives.  Id., ¶ 13.  Eleven K-12 schools fall within the toxic plume, placing more than 5,000 students at risk of daily exposure.[2]  Id., ¶ 16.  The facility remains an active and alarming hazard.  Its EPA Risk Screening Environmental Indicators ("RSEI") indicate its extreme hazard level.  Id., ¶ 19.  This severity is reflected in the average age of death in surrounding communities, which is 20 years shorter than that of residents just a few miles west of them in Wyandotte County.  Id., ¶ 21

---

[2]    Some named plaintiffs attended three of these schools: Lindbergh Elementary School, Emerson Elementary School, and New Stanley Elementary School.

## I.      Plaintiffs

Eight individuals and entities are named plaintiffs: Ellsworth William Jeffries III, Rocky Garner, Autumn Johnson on behalf of the estate of Weston T. Lawson, Jose L. Ramirez Jr., Kenique Smith, Estelle White and Diane L. Woods, individually and as administrator of the estate of Cecil B. McBee.

Jeffries[3] is a lifelong resident of Kansas City, Kansas, attended New Stanley Elementary School and had significant residential exposure to the toxic plume.  As a result, in 2020, Jeffries developed multiple myeloma, a blood cancer which requires extensive chemotherapy and stem cell replacement.  He continues to experience new and worsening conditions.

Garner lived near the facility for more than a decade.  As a professional truck driver, Garner's work brought him close to the facility.  In 2005, due to prolonged exposure to toxins there, he developed liver cancer.

Johnson brings suit on behalf of the estate of her deceased son, Weston Lawson.  Johnson lived near the facility while she was pregnant and after giving birth to Lawson.  Weston developed leukemia by the age of two and died before he reached the age of four.  Johnson alleges that her son's death resulted from inhalation of toxic emissions released at the facility.

Ramirez is a longtime resident of Kansas City and attended Emerson Elementary School. Ramirez developed lung cancer in 2018, after prolonged exposure to toxins emitted by the facility. He has undergone multiple surgeries related to his cancer, and his quality of life has suffered significantly.

Smith lived within two miles of the facility for most of her youth and attended Lindbergh Elementary School.  As a result, she developed breast cancer at age 35.  Throughout her extensive

---

[3]      In the initial complaint, plaintiffs' counsel misspelled Jeffries as "Jefferies."

battle with the disease, Smith underwent extensive rounds of chemotherapy, radiation therapy and nearly a dozen surgeries, including a double mastectomy.

White lived in Kansas City for approximately a decade and attended Emerson Elementary School.  At age 19, White experienced a miscarriage that led to testing which revealed cervical cancer.  In 2022, at the age of 34, White was diagnosed with breast cancer.  White alleges that her miscarriage and two cancer diagnoses resulted from toxic emissions from the facility.

Woods, a lifelong resident of Kansas City, attended Emerson Elementary School. After years of continuous exposure, she was diagnosed with breast cancer and had more than 40 rounds of radiation treatments.[4]

## II.     Defendants

Philips Electronics North America operated the facility from 1961 through 1981.  First Amended Complaint (Doc. #73) ¶ 41–42.[5]  Elementis Chemicals, Inc. owned and operated the facility from 1981 through 2001.  Id., ¶ 57–58.[6]  Harcros Chemicals Inc. ("Harcros") has operated the facility since 2001.

## III.    The Facility Emissions

Harcros uses the facility as a manufacturing plant, producing surfacants, emulsifiers, defoamers and specialty products by means of ethoxylation and propoxylation reactions.  Ethylene oxide ("EtO") is the primary toxin of concern to plaintiffs.  Id., ¶ 102.  The facility uses EtO in its

---

[4]     Woods is the legal representative of the estate of her late father, Cecil B. McBee, and in addition to her individual claims, she brings claims as the administrator of his estate.  She agreed to drop the claims by McBee's estate, since he died before Harcros possessed the facility in 2001.  Plaintiffs' Opposition To Harcros' Motion To Dismiss (Doc. #104) filed December 8, 2025 at 18.

[5]     Koninklijke Philips N.V. is the sole owner of Philips Electronics North America.  Id., ¶ 43, 46.

[6]     It is a wholly owned subsidary of Elementis PLC.  Id., ¶ 59-60.

ethoxylation reaction, a chemical process in which EtO reacts with alcohols, acids or other substrates to create ethoxylates that serve as building blocks for a wide range of commercial and household products.

The half-life of EtO in the atmosphere is reportedly as long as 211 days.  DNA-damaging properties of EtO exposure have been studied since the 1940s.  Id., ¶ 108.  In a 1977 report, the National Institute for Occupational Safety and Health ("NIOSH") concluded that occupational exposure to EtO may increase the frequency of mutations in human populations. NIOSH recommended that EtO be considered mutagenic and potentially carcinogenic to humans.  Id., ¶ 109.  In 1985, in the Fourth Annual Report on Carcinogens, EtO was first listed as reasonably anticipated to be a human carcinogen.  In 2000, that listing was revised to be a "known human carcinogen."  Id., ¶ 112.  The International Agency for Research on Cancer ("IARC") has evaluated its carcinogenicity for decades.  In 1994, classification for EtO was upgraded to "carcinogenic to humans (Group 1)."  This is the highest/most supported classification of a carcinogen available to the world's most trusted source of cancer research.  Id., ¶ 114  The Environmental Protection Agency ("EPA") has concluded that EtO is carcinogenic to humans by inhalation exposure.  The EPA's stated confidence in this classification is "HIGH." Id., ¶ 120.

Defendant's emission levels rival the country's largest industrial facilities and sterilization plants.  In 2022, out of more than 250 tracked facilities, the facility emitted the twelfth most EtO of any facility in the United States.  Most of the higher-emitting facilities are in rural areas with appreciably lower populations than Kansas City, making this facility a unique threat to public health. Id., ¶ 131.

While EtO is highly volatile and tends to dissipate from surfaces, its continued and uncontrolled release into the air has created recurring, daily exposure hazards for residents over

decades. Each day of emission has added to the cumulative cancer risk in surrounding neighborhoods. Id., ¶ 138.

The facility's ethoxylation chemical process uses EtO and always leaves a portion unreacted, meaning a portion of the EtO always survives the process. It also yields 1,4-dioxane, which has long been recognized as a probable human carcinogen–persistent in the environment and hazardous when inhaled or in water supplies. Id., ¶ 135.

EtO does not disappear without consequence. Once released, it reacts to form other compounds—including ethylene glycol and ethylene chlorohydrin—that can persist in soils and groundwater and present additional hazards. Id., ¶ 139. The ethoxylation operations at the facility released other hazardous pollutants such as 1,4-dioxane. Unlike EtO, these semi-volatile compounds drop out of airborne plumes, bind to soils and remain for years or decades, contaminating residential property and water resources. Id., ¶ 140

In June of 2025, in accordance with its Air Emission Source Construction Permit from the Kansas Department of Health & Environment ("KDHE"), Harcros conducted air sampling immediately outside the facility. This was done with a summa canister, a stainless-steel vacuum vessel designed to collect whole air samples over a defined period and captures an unmodified snapshot of ambient conditions. Id., ¶ 143. Placed near the facility's storage and reaction tanks, the canisters detected EtO concentrations exceeding 2,000 parts per billion (ppb). These readings represent actual breathing air—not emissions tested at a stack or laboratory extrapolations. Id., ¶ 144. According to the National Institute of Health ("NIH"), the threshold EtO concentration associated with elevated cancer risk is 0.011 ppb. Id., ¶ 145

In 2016, researchers from Ohio State University published a report on the poor state of public health and environmental justice concerns in Wyandotte County. It found that the average

age at death in the vicinity of the facility was about 20 years lower than the average just a few miles west in Wyandotte County.  Id., ¶ 158.

Plaintiffs filed suit on June 30, 2025, alleging that emissions from the facility caused them to develop cancer or have miscarriages.  Plaintiffs filed their First Amended Complaint (Doc. #73) on October 1, 2025, asserting six theories of recovery: strict liability for abnormally dangerous activities, gross negligence, negligence, negligent construction, wrongful death and failure to warn.

Harcros filed this motion to dismiss, arguing that plaintiffs' first amended complaint should be dismissed because the Kansas statute of repose bars many of plaintiffs' claims and plaintiffs do not adequately state any claims under Rule 12(b)(6), Fed. R. Civ. P.  Harcros' Motion To Dismiss Plaintiffs' First Amended Complaint (Doc. #85) filed October 31, 2025.

## Analysis

### I.    Statute Of Repose

Under the Kansas statute of repose, Harcros seeks to dismiss all claims for negligent construction and the individual claims by three of the eight named plaintiffs (Garner, Smith and White).  In Kansas, K.S.A. § 60-513(a) sets the general statute of limitations at two years. Subsection (b) of K.S.A. § 60-513 provides that causes of action do not accrue until the act giving rise to the action causes substantial injury, or until the injury is reasonably ascertainable to the injured party.  Subsection (b) also imposes a ten-year statute of repose, which states that "in no event" may a party commence an action more than ten years beyond the time of the act giving rise to the cause of action, regardless of the injured party's knowledge of the injury.  The full text of K.S.A. § 60-513(b) is as follows:

> (b) Except as provided in subsections (c) and (d), the causes of action listed in subsection (a) shall not be deemed to have accrued until the act giving rise to the

cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, **but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action.**

K.S.A. § 60-513(b) (emphasis added).[7]

The statute of repose operates as a general grant of immunity against claims arising more than ten years after defendant's actions and abolishes a cause of action even if it has not yet accrued. O'Neill v. Dunham, 41 Kan. App. 2d 540, 544, 203 P.3d 68, 71 (2009). Under Kansas law, the statute of repose establishes a maximum time to seek legal relief after a causative event has occurred, even if no discernible injury has yet manifested itself; it may create finality for meritorious suits even when the plaintiffs are not responsible for the delay. H.B. v. M.J., 315 Kan. 310, 312, 508 P.3d 368, 371 (2022).

    A.    Negligent Construction Claims

Plaintiffs allege that the facility was constructed in December of 1960, and do not allege construction within the last ten years which would save their negligent construction claim (Count IV).[8] Plaintiffs do not respond to Harcros' motion to dismiss the negligent construction claim. The negligent construction claim is both waived and plainly barred by the statute of repose. See, e.g., Palmer v. Unified Gov't of Wyandotte Cty./Kan. City, 72 F. Supp. 2d 1237, 1250–51 (D. Kan. 1999).

---

[7]    K.S.A. § 60-513 subsections (c) and (d) modify the statute of limitations for suits involving professional services by a health care provider or corporations suing their own officers and are not applicable here. K.S.A. § 60-513(a) lists various causes of action: trespass, taking, detaining or injuring personal property, fraud, injury to the rights of another, not arising on contract, wrongful death, ionizing radiation injury and failure to render professional services by a health care provider.

[8]    Count IV also alleges negligent repair and maintenance which allegedly happened within the last ten years. Harcros does not seek to dismiss on statute of repose grounds.

B.     <u>Individual Plaintiffs</u>

Harcros seeks to dismiss the individual claims of Garner, Smith and White. It notes that Garner was diagnosed with cancer in 2005, more than 20 years ago. Smith is at least 35, lived near the facility for "most of her youth," and attended a nearby elementary school. She does not allege exposure to toxins from the facility within the last ten years. White lived in Kansas City for "approximately a decade" while attending elementary school, but she was born in 1988 and does not allege exposure in the last ten years.

The statute of repose plainly bars any claims that arise from acts which defendants committed more than ten years ago. See <u>Black v. Union Pac. R.R. Co.</u>, 23-CV-1218-EFM-ADM, 2024 WL 1604620, at *3 (D. Kan. Apr. 12, 2024). Plaintiffs seek to avoid the statute of repose on several grounds, arguing that: (1) the latent disease exception applies to their claims, (2) the statute of repose should run from Harcros' last failure to warn of the emissions, which is within ten years, and (3) Harcros continues to emit harmful EtO, and the cause of action accrues anew with each such emission.

        i.     Kansas Products Liability Act Latent Disease Exception

To save their claims, plaintiffs invoke the Kansas Product Liability Act ("KPLA") latent disease exception to the statute of repose. The KPLA, K.S.A. § 60-3301 <u>et. seq.</u>, governs all legal claims regarding damage or injury caused by defective products, and applies to all product liability claims regardless of the substantive theory of recovery. See <u>Savina v. Sterling Drug, Inc.</u>, 247 Kan. 105, 126, 795 P.2d 915, 931 (1990). Subsection (d) of K.S.A. § 60-3303 limits the statute of repose in product liability claims. Where exposure to a harmful material causes a latent disease, the ten-year limit runs from when the disease and its cause are made known to the injured or the point at which the injured person should have been aware. Section 60-3303 (d)(1) states as

-10-

follows:

> In a product liability claim against the product seller, the ten-year limitation, as defined in K.S.A. 60-513, and amendments thereto, shall not apply to the time to discover a disease which is latent caused by exposure to a harmful material, in which event the action shall be deemed to have accrued when the disease and such disease's cause have been made known to the person or at the point the person should have been aware of the disease and such disease's cause.

Plaintiffs argue that the cause of their diseases was unknown until recently, so the ten-year statute of repose does not bar their claims.

Section 60-3303(d)(1) only applies to "a product liability claim against the product seller." Plaintiffs first amended complaint does not reference the KPLA or assert product liability claims. Their claims do not relate to defective products that they purchased from Harcros, and except to advance the latent disease exception, plaintiffs do not treat their claims as product liability claims.

Plaintiffs argue that their claims are product liability claims under the KPLA, because Harcros is a "product seller," the KPLA does not specifically limit actions to consumers of products and their claims relate to harm caused by the manufacture, production, preparation and warnings regarding its products.  <u>Plaintiffs' Response To Harcros' Motion To Dismiss</u> (Doc. #104) filed December 8, 2025 at 20.  The KPLA defines a product liability claim as a claim:

> brought for harm caused by the manufacture, production, making, construction, fabrication, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage or labeling of the relevant product.

K.S.A. § 60-3302(c).

Facially, plaintiffs' claims appear to fit the KPLA's definition for a product liability claim, since they are "brought for harm caused by the manufacture . . . of the relevant product"–industrial chemicals and supplies. The legislative intent behind the KPLA and Kansas precedent, however, make clear that plaintiffs' claims are not product liability claims.

Though plaintiffs' claims are concerned with the manufacture of chemical products and

failure to adequately warn of hazards, plaintiffs' claims do not sound in product liability. Plaintiffs' harm does not arise from Harcros products themselves, but rather the emissions which result from the manufacture, storage and transport processes related thereto.

Statutory interpretation is a question of law for the Court to resolve. Martindale v. Robert T. Tenny, M.D., P.A., 250 Kan. 621, 626, 829 P.2d 561, 565 (1992) (citations omitted). Kansas rules of statutory construction provide that a statute is not to be arbitrarily construed according to its strict letter, but must be given a construction that will advance the sense and meaning fairly deducible from the context. See Mahone v. Mahone, 213 Kan. 346, 350, 517 P.2d 131, 134 (1973). In construing statutes, the legislative intent is to be determined by considering and construing together all parts of the statute in pari materia, and the courts must not consider only an isolated part or parts of an act. Board of County Comm'rs of Johnson County v. Greenhaw, 241 Kan. 119, 126, 734 P.2d 1125, 1131 (1987).

The fact that the legislature decided to make the latent disease exception part of the Kansas Products Liability Act indicates a clear intent to limit the exception to a specific class of tort actions—product liability claims. Koch v. Shell Oil Co., 820 F. Supp. 1336, 1341 (D. Kan. 1993).

Here, plaintiffs' claims are not traditional product liability claims, i.e. claims arising due to harm from a defective product. Though harm due to manufacture and storage is mentioned in the statute, the fair meaning deducible from the context of the law is that the KPLA covers actions that result in defective products that cause harm. Hence, "product liability" does not include all harms related to manufacturing (e.g. unsafe factory conditions for employees) or storage (e.g. attractive nuisance) of products. It is highly doubtful the legislature intended the exception to be as far reaching as plaintiffs argue—essentially covering any tort that arises from commercial activity related to the manufacture, design, installation, testing, warnings, marketing, packaging or

storage of goods, unrelated to products which actually cause harm.

Further, Kansas courts have not applied the KPLA beyond defective product cases. The underlying purpose of the KPLA is "to consolidate all product liability actions, regardless of theory, into one theory of legal liability." Patton v. Hutchinson Wil–Rich Mfg. Co., 253 Kan. 741, 756, 861 P.2d 1299, 1311 (1993); Fennesy v. LBI Mgmt., Inc., 18 Kan.App.2d 61, 66, 847 P.2d 1350, 1355 (1993) (purpose of KPLA to merge all legal theories of product liability into single product liability claim). This one theory of liability is invariably for a defective product. See id.

For a product liability claim, Kansas law recognizes that a product can be defective in one of three ways: (1) a manufacturing defect, i.e. a flaw in the manufacturing of the product; (2) a warning defect, i.e. a failure to adequately warn of a risk or hazard related to the product design; or (3) a design defect, i.e. a product which although perfectly manufactured contains a defect that makes it unsafe. Savina v. Sterling Drug. Inc., 247 Kan. 105, 114, 795 P.2d 915, 923 (1990); Hiner v. Deere & Co., 161 F.Supp.2d 1279, 1282–83 (D. Kan. 2001), rev'd in part on other grounds, 340 F.3d 1190 (10th Cir. 2003). To succeed on a defective product claim, plaintiffs "must produce proof of three elements: (1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time it left the defendant's control." Samarah v. Danek Med., Inc., 70 F. Supp. 2d 1196, 1202 (D. Kan. 1999) (quoting Jenkins v. Amchem Products, Inc., 256 Kan. 602, 630, 886 P.2d 869, 886 (1994)). Plaintiffs do not allege any of these necessary elements, since plaintiffs' allegations are not directed to relevant products that Harcros sold, but to emissions which are byproducts of the manufacture, transport and storage of its products. Therefore, plaintiffs have not sufficiently alleged a product liability claim.

Plaintiffs offer no case law to support their position that claims concerning toxic emissions

that result from product manufacture qualify as product liability claims under the KPLA. Plaintiffs rely on Harding v. K.C. Wall Prods., Inc., 831 P.2d 958, 960 (Kan. 1992), to argue that the latent disease exception should apply. In that case, the Kansas Supreme Court applied the KPLA to a non-purchaser who suffered injury from a manufacturer's failure to warn of potential asbestos exposure from drywall products. In Harding, however, the Kansas Supreme Court applied the latent disease exception only to those plaintiffs who were exposed to the defective drywall product. Here, plaintiffs do not allege that Harcros' products are defective or that they were exposed to products of Harcros. Therefore, the latent disease exception in the KPLA does not save the claims by Garner, Smith and White—whose last exposures were more than ten years ago.

ii.      Last Failure To Warn

Plaintiffs argue that because defendant had a continuing duty to warn, the ten-year statute of repose runs from defendant's last failure to warn, not from when it created the hazard. Under their reasoning, the statute of repose did not start to run until the last failure to warn, which is within the last ten years.[9]

Defendant's duty to warn exists only prior to plaintiffs' injury, since a warning after the injury has occurred serves no purpose. See Grey v. City of Topeka No. 117,652, 2018 Kan. App. Unpub. LEXIS 199 (Ct. App. Mar. 16, 2018). Plaintiffs acknowledge this rule. See Response To Defendant's Motion To Dismiss (Doc. #104) filed December 18, 2025 at 25. Citing Grey, plaintiffs stated "the last day the City could have breached its duty to warn was the day the plaintiff was injured—not the day the City created the alleged hazard."

Here, the last day that Harcros could have breached a duty to warn a plaintiff was the day

---

[9]      Plaintiffs allege that since defendant has a continuing duty to warn and has never adequately warned plaintiffs, this cause of action continues to accrue.

that plaintiff was injured, i.e. the last occasion he or she was exposed to its toxic emissions that allegedly caused their injuries. See H.B., 508 P.3d at 371 (statute of repose establishes maximum time to seek legal relief after causative event has occurred, even if no discernible injury has yet manifested itself). Since the latest breach of a duty to warn is the day of plaintiff's injury, it has no effect on the statute of repose in this case. The last day that Harcros could have breached its duty to warn Garner, Smith and White was the date of their injuries. The statute of repose bars the claims of Garner, whose injury occurred more than ten years prior to filing suit. Smith and White appear to have been exposed more than ten years before filing, but developed cancer within the last ten years. The statute of repose also bars their claims, since their injuries occurred when they were exposed to the toxic emissions, even though their diseases did not manifest until years later. See id.

### iii. Ongoing Wrongful Acts

Plaintiffs argue that the statute of repose does not bar the claims of Garner, Smith and White because under Kansas law, where a cause of action is predicated on numerous acts occurring over an extended period, the cause of action accrues anew with each act. They argue that each time that defendant emitted hazardous substances, violated reporting obligations or withheld required information constituted a fresh act that postponed the accrual date, and they only need to allege one wrongful act within ten years of filing suit. This argument misstates Kansas law on the statute of limitations and misapplies statute of limitations law to the statute of repose.

Under the statute of limitations, ongoing tortious conduct does reset the accrual date for the cause of action. See Hoery v. United States, 324 F.3d 1220, 1224 (10th Cir. 2003). Most importantly, this continues until the injury becomes permanent. Cordon v. Trans World Airlines, Inc., 442 F. Supp. 1064, 1066 (D. Kan. 1976); see Miller v. Cudahy Co., 858 F.2d 1449, 1454

(10th Cir. 1988). Here, Garner, Smith and White's injuries became permanent when they were exposed to toxic emissions—more than ten years before they filed suit.

More importantly, statute of limitations analysis does not apply because the statute of repose does not consider when the action actually accrued. The statute of repose operates as a general grant of immunity against claims arising more than ten years after defendant's actions and abolishes a cause of action even if it has not yet accrued. O'Neill, 41 Kan. App. 2d at 544. Plaintiffs allege repeated emissions from the facility from 1960 to the present, but for Garner, Smith and White, the acts that gave rise to their causes of action were emissions to which defendant exposed them prior to their injuries. Therefore, Garner, Smith and White have not stated claims on which relief can be granted for emissions which occurred more than ten years prior to this action.

The statute of repose has a tolling exception for fraudulent concealment. If fraudulent concealment by defendant prevents plaintiff from discovering the injury, then both the two-year statute of limitations and the ten-year statute of repose are tolled until plaintiff could reasonably ascertain the injury. Robinson v. Shah, 23 Kan. App. 2d 812, 826, 936 P.2d 784, 794 (1997). This tolling exception, however, only applies to claims based on fraud. Bonin v. Vannaman, 261 Kan. 199, 207, 929 P.2d 754, 762 (1996) (fraudulent concealment only tolls time period if plaintiff's claim for relief is validly grounded in fraud); Doe v. Popravak, 55 Kan. App. 2d 1, 14, 421 P.3d 760, 769 (2017) (only valid claims of fraud and fraudulent concealment can toll statute of repose); Freebird, Inc. v. Merit Energy Co., 883 F. Supp. 2d 1026, 1035 (D. Kan. 2012) (Kansas Supreme Court has reiterated that fraud and concealment toll running of statute of limitations only when relief is sought on the ground of fraud); Mariscal v. Valadez, 756 F. Supp. 3d 1154, 1159 (D. Kan. 2024).

The first amended complaint at ¶96, ¶101 briefly mentions fraudulent concealment, but plaintiffs do not respond to Harcros' motion to dismiss those claims. Those arguments are therefore waived. See, e.g., Palmer, 72 F. Supp. 2d at 1250–51 ("[T]he court deems plaintiff's failure to respond to an argument raised in defendants' papers tantamount to an express abandonment of any such claim.")

Furthermore, plaintiffs' claims are not grounded in fraud. See Mariscal v. Valadez, 756 F. Supp. 3d 1154, 1160–61 (D. Kan. 2024). Plaintiffs therefore cannot rely on fraudulent concealment to avoid the statute of repose.

   iv.  Summary

For the above reasons, Harcros' motion to dismiss is sustained as to named plaintiffs Garner, Smith and White.

## II. 12(b)(6) Failure To State A Claim

Harcros moves to dismiss all of plaintiffs' claims under Rule 12(b)(6) because plaintiffs' complaint lacks sufficient factual allegations to state any plausible claim. Specifically, Harcros argues that the complaint should be dismissed because it (1) is impermissibly vague since it groups all plaintiffs/defendants together, (2) does not sufficiently allege that toxic chemicals were elevated in plaintiffs' community or that Harcros caused those chemicals, (3) does not allege that Harcros engaged in an abnormally dangerous activity, (4) does not sufficiently allege facts to show causation for negligence claims, (5) does not allege specific dates for some claims and (6) imposes a duty to warn without legal justification.

Plaintiffs respond that they have alleged sufficient facts for purposes of notice pleading, that Harcros did engage in an abnormally dangerous activity and that Harcros has a legal duty to warn of the hazard it created.

A.      Group Pleading

Harcros argues that plaintiffs' claims are too vague because they do not specify which plaintiffs have claims against which defendant, but groups them all together.  It argues that dismissal is proper when the Court "cannot tell which defendant is alleged to have done what, [nor] what the misconduct was."  Burnett v. Mortgage Elec. Registration Sys., Inc., 706 F.3d 1231, 1240 (10th Cir. 2013).

Plaintiffs allege that the facility has emitted EtO and other toxic chemicals from 1960 to at least 2025.  Plaintiffs also allege the dates when Harcros operated the facility.  Plaintiffs allege that Harcros began owning the facility in 2001 and has owned and operated the facility since that time.  Harcros' argument here fails.  Plaintiffs clearly allege that the facility emitted toxic chemicals, and who owned and operated the facility at all relevant times.

B.      Chemical Levels Attributable To Harcros

Harcros argues that plaintiffs fail to allege sufficient facts concerning the "other toxic chemicals," and fail to allege sufficient facts that show EtO or other chemicals levels were elevated in their communities.

In ruling on a motion to dismiss under Rule 12(b)(6), the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement of relief.  Iqbal, 556 U.S. at 679.  Plaintiffs have alleged sufficient facts that they are plausibly entitled to relief.  The summa-canister testing at the facility in June of 2025 found heightened levels of EtO, and plaintiffs alleged that EtO spreads through the air, which plausibly supports a claim that EtO levels were heightened in their community.  Expert-level causation analysis of exposure levels is not necessary at this stage.  See, e.g., Pavone v. Am. Contract Sys., No. 2:24-cv-1054-KCD-NPM, 2025 U.S. Dist. LEXIS 199912, at *6 (M.D. Fla. Oct. 9, 2025)); Bell v. 3M Co., 344 F.

Supp. 3d 1207, 1226 (D. Colo. 2018).

    C.    <u>Strict Liability (Count I)</u>

Count I claims that Harcros is strictly liable for abnormally dangerous activities in using and emitting EtO and other toxic chemicals from a facility that is improperly located. Harcros seeks to dismiss Count I because plaintiffs do not sufficiently allege that it engaged in abnormally dangerous activity. The Kansas Supreme Court has adopted the Restatement (Second) of Torts §§ 519 and 520. <u>See</u> <u>Williams v. Amoco Prod. Co.</u>, 241 Kan. 102, 115 (1987). Section 519 provides that "[o]ne who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm." <u>See</u> Restatement (Second) of Torts § 519(1). Section 520 provides as follows:

> In determining whether an activity is abnormally dangerous, the following factors are to be considered:
> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
> (b) likelihood that the harm that results from it will be great;
> (c) inability to eliminate the risk by the exercise of reasonable care;
> (d) extent to which the activity is not a matter of common usage;
> (e) inappropriateness of the activity to the place where it is carried on; and
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

<u>Id</u>. The amended complaint identifies the abnormally dangerous activity in this case as the "transportation, transfer, handling, processing, and emission of EtO and other toxic chemicals from a facility that is improperly located." <u>First Amended Complaint</u> (Doc. #73) ¶ 184. Plaintiffs address the Section 520 factors in paragraphs 174 through 181 of their first amended complaint. Plaintiffs allege a high degree of risk from the EtO and other chemicals released into residential air and allege a great likelihood of harm from such exposure according to various scientific studies. Plaintiffs also allege that the facility's proximity to neighborhoods and schools results in

operations producing unsafe emission levels, that even minimal chronic exposure increases cancer risk, that the risk cannot be eliminated through reasonable care and that the location of the facility is not a matter of common usage and is inappropriate.  Plaintiffs do not discuss the value of the facility operation to the community, but do allege its harms.  On balance, for purposes of notice pleading, plaintiffs allege sufficient facts to support a finding of abnormally dangerous activity under Kansas law.

     D.     <u>Negligence Claims (Counts II–IV)</u>

Count II claims that Harcros was grossly negligent through willful, wanton or reckless actions of knowingly and continuously emitting EtO and other toxic chemicals into the community near the facility.  Count III alleges that Harcros was negligent by emitting EtO and other toxic chemicals.  Count IV claims that Harcros was negligent in the construction, repair and maintenance of the facility by failing to construct or modify the facility to ensure that unsafe levels of chemicals were not released.

Harcros asserts the Court should dismiss these claims because plaintiffs fail to allege that chemical levels were elevated where they lived, worked or attended school, that they fail to adequately identify that defendant had a duty to plaintiffs and that they fail to attribute elevated chemical levels to its conduct.

Although plaintiffs' allegations do not identify the exact time, place or dosage of exposure that plaintiffs suffered, they do give defendant fair notice of the grounds upon which plaintiffs' claims rest.  See <u>Erickson v. Pardus</u>, 551 U.S. 89, 93 (2007) (pleadings need only give defendant fair notice of what claim is and grounds on which it rests); <u>see also</u> <u>Burnett v. Mortg. Elec. Registration Sys.</u>, 706 F.3d 1231, 1235 (10th Cir. 2013) (plaintiffs only need to give fair notice of claim).  Rule 8, Fed. R. Civ. P., only requires fair notice, and plaintiffs' complaint does not need

to identify the expert-level dosage analysis or the exact location and date of exposure. Id. Plaintiffs allege studies that show EtO can cause cancer, uncontrolled emissions by Harcros, a summa-canister test in 2025 which supports that position, as well as the fact that Harcros did not utilize proper controls to contain toxic chemicals. Plaintiffs allege that their homes, schools and jobs were located within three miles of the facility, regardless of any "census tracts" in which they may or may not have lived. Defendant's Brief In Support Of Its Motion To Dismiss (Doc. #86) filed October 31, 2025 at 11. Defendant attempts to heighten plaintiffs' burden of pleading by relying on inapposite cases which discuss motions for summary judgment, not Rule 12(b)(6) motions.

Negligence is "the lack of ordinary care." Elstun v. Spangles, Inc., 289 Kan. 754, 755, 217 P.3d 450, 453 (Kan. 2009) (citations omitted). To succeed on a negligence claim, plaintiffs must establish that (1) defendant owed them a duty; (2) defendant breached that duty; (3) the breach caused plaintiffs' injury; and (4) plaintiffs sustained damages. Adams v. Bd. of Sedgwick Cty. Comm'rs., 289 Kan. 577, 584, 214 P.3d 1173, 1179 (2009).

Harcros argues that plaintiffs have not adequately alleged the elements of duty and breach. The Court rejects this argument. Plaintiffs have alleged that Harcros owed a duty to exercise reasonable care for the health, safety and well-being of individuals who live, attend school or work near the facility, and that it breached that duty in negligently handling EtO and allowing it to escape the facility. Harcros has not cited any authority that more is required to plead negligence under Rule 8(a). Plaintiffs have not pleaded their claims in conclusory fashion, but have alleged specific facts regarding the nature of Harcros' negligence. Harcros does not provide an adequate basis to conclude that plaintiff's claims are not plausible.

Finally, Harcros argues that plaintiffs have not alleged facts sufficient to show causation.

-21-

It argues that the studies cited by plaintiffs' only show that EtO causes cancer, not plaintiffs' specific cancers, and that plaintiffs' injuries are not traceable to the alleged chemicals.  This argument is without merit.  Taken as a whole and assuming as true all well–plead facts, plaintiffs' allegations sufficiently plead causation. Specifically, plaintiff's complaint alleges that Harcros leaked high levels of EtO, proven through testing, which necessarily would have dispersed into the surrounding area.  Plaintiffs allege that EtO causes cancer, heightened death rates in the area and their own injuries.  Harcros has not cited any authority which suggests that such allegations of causation are legally insufficient for purposes of Rule 12(b)(6).  See Cambers v. Bureau Veritas N. Am., Inc., No. 21-2222-JWL, 2022 WL 198812, at *2 (D. Kan. Jan. 21, 2022).

For these reasons, the Court overrules the motion to dismiss Counts II through IV.

E.    Wrongful death (Count V)

Count V alleges that wrongful conduct by Harcros directly resulted in Lawson's untimely death due to chronic exposure to EtO and other toxic chemicals emitted by the Harcros facility.

Harcros asks the Court to dismiss the wrongful death claim, arguing that plaintiff does not provide his birth or death dates, the dates of his in utero exposure or when he lived near the facility. The complaint alleges that Lawson's mother "lived near the facility as a child, while pregnant, and after giving birth" and that Lawson "was exposed to the toxic emissions in utero and throughout his short life, while he resided in the plume."  First Amended Complaint (Doc. #73) ¶ 23.  These facts are sufficient under notice pleading standards to support Lawson's claim for wrongful death. See Pardus, 551 U.S. at 93.

F.    Failure To Warn (Count VI)

Count VI claims that Harcros breached its duty to warn plaintiffs of its hazardous emissions.  Harcros argues that plaintiffs have failed to state a claim for failure to warn because

they do not show that Harcros had a duty to warn the community surrounding the facility. Neither party has cited Kansas case law regarding a defendant's duty to warn a community for toxic emissions.

To state a claim for failure to warn, plaintiffs must allege sufficient facts to show that Harcros plausibly owed them a duty to warn of the hazard and breached that duty. See Hamner v. BMY Combat Sys., 869 F. Supp. 888, 893 (D. Kan. 1994). Kansas courts have recognized the broad principle that an actor who creates a hazardous condition has a duty to use reasonable care to warn others of the condition or to correct it. See Est. of Pennington ex rel. Pennington v. Wolfe, 262 F. Supp. 2d 1254, 1260 (D. Kan. 2003) (citing Restatement (Second) of Torts, § 321 (1965)); William L. Prosser, The Law of Torts § 56, at 342–43 (4th ed.)). Though not exactly analogous, the post-sale standards for a duty to warn are helpful in determining how a Kansas court would likely analyze plaintiffs' claims. Manufacturers have a post-sale duty to warn ultimate consumers who purchased the product who can be readily identified or traced when a defect, which originated at the time the product was manufactured and was unforeseeable at the point of sale, is discovered to present a life threatening hazard. Patton v. Hutchinson Wil-Rich Mfg. Co., 253 Kan. 741, 759, 861 P.2d 1299, 1313 (1993). The court analyzes whether defendant had a duty to warn on a case-by-case basis and considers such factors as (1) the nature of the harm that may result without notice, (2) the likelihood that harm will occur, (3) how many persons are affected, (4) the economic burden on the manufacturer of identifying and contacting those exposed to the hazard, (5) the nature of the industry, (6) the type of product involved, (7) the number of units manufactured or sold and (8) steps taken other than giving of notice to correct the problem. Patton, 253 Kan. at 761–62.

Here, plaintiffs have sufficiently stated a claim for failure to warn under Rule 12(b)(6).

They allege known serious harms to exposure to EtO including various cancers, that Harcros should have known of its leaks and the likelihood that EtO would spread to surrounding communities, that many people lived in those communities and that it made no effort to warn the communities. Plaintiffs have alleged facts which support a plausible claim under Rule 12(b)(6) and Harcros has fair notice of plaintiffs' claims. See Robbins, 519 F.3d at 1248.

For these reasons, the Court overrules the motion to dismiss Count VII.

G.      Punitive Damages (Count VIII)

Count VIII claims that Harcros is liable for punitive damages due to its deliberate, willful, wanton and grossly negligent conduct, which demonstrates a conscious, reckless disregard and indifference to human life by knowingly emitting hazardous chemicals.

Harcros requests dismissal of Count VIII because punitive damages are a category of relief, not a cause of action. Plaintiffs do not dispute this point, but argue that "because punitive damages [are] a remedy, rather than a cause of action, it is 'procedurally premature' for a defendant to attempt to dismiss it." Plaintiffs' Response (Doc. #104) at 18. Though Count VIII incorrectly stylizes it as a cause of action, plaintiffs sufficiently allege facts to support punitive damages as a remedy. Therefore, the Court overrules the motion to dismiss plaintiffs' claims for punitive damages.

**IT IS THEREFORE ORDERED** that Harcros Chemicals Inc.'s Motion To Dismiss Plaintiff's First Amended Complaint (Doc. #85) filed October 31, 2025 is **SUSTAINED IN PART.** It is **SUSTAINED** as to all claims by Garner, Smith, White and the estate of McBee, and plaintiffs' negligent construction claim of Count IV (but not as to the negligent repair and maintenance claims of Count IV). Harcros' motion is **OVERRULED in regard to all other claims.**

-25-

Dated this 9th day of April, 2026 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge